RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 09a0366p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

————————————

SCHOOL DISTRICT OF THE CITY OF PONTIAC,
et al.,

                    *Plaintiffs-Appellants,*

        *v.*

SECRETARY OF THE UNITED STATES
DEPARTMENT OF EDUCATION,

                    *Defendant-Appellee.*

No. 05-2708

————————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-71535—Bernard A. Friedman, District Judge.

Argued: December 10, 2008

Decided and Filed: October 16, 2009

Before: BATCHELDER, Chief Judge; MARTIN, BOGGS, DAUGHTREY, MOORE,
COLE, CLAY, GILMAN, GIBBONS, ROGERS, SUTTON, COOK, McKEAGUE,
GRIFFIN, KETHLEDGE, and WHITE, Circuit Judges.

————————————

## COUNSEL

**ARGUED:** Robert H. Chanin, BREDHOFF & KAISER, P.L.L.C., Washington, D.C., for
Appellants. Alisa B. Klein, UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee. **ON BRIEF:** Robert H. Chanin, Jeremiah A. Collins, BREDHOFF &
KAISER, P.L.L.C., Washington, D.C., Dennis R. Pollard, THRUM LAW FIRM, P.C.,
Bloomfield Hills, Michigan, Alice Margaret O'Brien, CALIFORNIA TEACHERS
ASSOCIATION, Burlingame, California, Philip A. Hostak, OFFICE OF GENERAL
COUNSEL, NATIONAL EDUCATION ASSOCIATION, Washington, D.C., for
Appellants. Alisa B. Klein, Mark B. Stern, UNITED STATES DEPARTMENT OF
JUSTICE, Washington, D.C., for Appellee.

      COLE, J., (pp. 2–36) delivered an opinion in favor of reversing the district court's
judgment of dismissal, in which MARTIN, DAUGHTREY, MOORE, CLAY, GILMAN,
and WHITE, JJ., joined, and in which GIBBONS, J., joined in part. SUTTON, J., (pp.
37–67) delivered a separate opinion concurring in the order affirming the district court's
judgment, in which BATCHELDER, C.J., BOGGS, COOK, and KETHLEDGE, JJ., joined,
and in which McKEAGUE, J., joined as to Part II only, with McKEAGUE, J., (pp. 68–88)
also delivering a separate opinion concurring in affirming dismissal, in which ROGERS and

1

GRIFFIN, JJ., joined as to Part II only. GIBBONS, J., (pp. 89–93) delivered a separate opinion in favor of reversing the judgment of the district court.

————————————

**OPINION**

————————————

COLE, Circuit Judge. The controversy presently before this Court is neither particularly complicated nor inherently political. Understanding the precise question before us means understanding what this case does not present—namely, this case does not ask us to enter the political arena to judge the relative merits of the No Child Left Behind Act of 2001 ("NCLB" or "the Act"), 20 U.S.C. §§ 6301–7941. Also, this case has nothing to do with the ongoing debate between the various advocates of state versus federal educational funding. Rather, we need to answer only a straightforward question of statutory interpretation: Whether, analyzed under the Spending Clause of the United States Constitution, the obligations set forth in NCLB are unambiguous such that a state official would clearly understand her responsibilities under the Act.

Plaintiffs-Appellants are school districts and education associations (collectively, "Plaintiffs")[1] that receive federal funding under NCLB in exchange for complying with the Act's various educational requirements and accountability measures. Based on the so-called "Unfunded Mandates Provision," which provides that "[n]othing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act," 20 U.S.C. § 7907(a), Plaintiffs filed suit in district court against the Secretary of the United States Department of Education (the

———————————

[1]Plaintiffs consist of nine school districts from three different States (Michigan, Texas, and Vermont) and ten education associations from ten different States (Connecticut, Illinois, Indiana, Michigan, New Hampshire, Ohio, Pennsylvania, Texas, Utah, and Vermont). The school districts are Pontiac School District, Laredo Independent School District, Leicester Town School District, Neshobe Elementary School District, Otter Valley Union High School, Pittsford Town School District, Rutland Northeast Supervisory Union (which itself contains eleven school districts), Sudbury Town School District, and Whiting Town School District (collectively, the "school district Plaintiffs"). The education associations are the National Education Association ("NEA") and ten NEA-affiliate education associations: the Connecticut Education Association, the Illinois Education Association, the Michigan Education Association, the Ohio Education Association, the Reading Education Association, the Utah Education Association, the Indiana State Teachers Association, the Texas State Teachers Association, NEA-New Hampshire, and the Vermont NEA (collectively, the "education association Plaintiffs").

"Secretary") seeking a declaratory judgment that they need not comply with the Act's requirements where doing so would result in increased costs of compliance not covered by federal funds. The district court concluded that Plaintiffs must comply with the Act's requirements regardless of any federal-funding shortfall and, accordingly, granted the Secretary's motion to dismiss the complaint for failure to state a claim upon which relief can be granted.

## I. BACKGROUND

### A.      The No Child Left Behind Act

On January 8, 2002, then-President George W. Bush signed NCLB into law. The Act—"a comprehensive educational reform"—amended the Elementary and Secondary Education Act of 1965 ("ESEA"), Pub. L. No. 89-10, 79 Stat. 27 (codified as amended at 20 U.S.C. §§ 6301–7941 (2003)). *See Connecticut v. Spellings*, 453 F. Supp. 2d 459, 468 (D. Conn. 2006). The ESEA targeted funding to students in low-income schools, and its purposes included overcoming "any effects of past racial discrimination." *George v. O'Kelly*, 448 F.2d 148, 151 (5th Cir. 1971); *accord Barrera v. Wheeler*, 475 F.2d 1338, 1340 (8th Cir. 1973); *United States v. Jefferson County Bd. of Educ.*, 372 F.2d 836, 851 (5th Cir. 1966). The ESEA was periodically reauthorized and amended over the next few decades.

In contrast to prior ESEA iterations, NCLB "provides increased flexibility of funds, accountability for student achievement and more options for parents." 147 Cong. Rec. S13365, 13366 (2001) (statement of Sen. Bunning). The Act focuses federal funding more narrowly on the poorest students and demands accountability from schools, with serious consequences for schools that fail to meet academic-achievement requirements. *Id.* at 13366, 13372 (statements of Sens. Bunning, Landrieu, and Kennedy). States may choose not to participate in NCLB and forgo the federal funds available under the Act, but if they do accept such funds, they must comply with NCLB requirements. *See, e.g.*, 20 U.S.C. § 6311 ("For any State *desiring* to receive a grant under this part, the State educational agency shall submit to the Secretary a plan . . . .")

(emphasis added); *see also Spellings*, 453 F. Supp. 2d at 469 ("In return for federal educational funds under the Act, Congress imposed on states a comprehensive regime of educational assessments and accountability measures."). In addition, with enumerated exceptions, under NCLB "the Secretary may waive any statutory or regulatory requirement . . . for a State educational agency, local educational agency, Indian tribe, or school through a local educational agency, that . . . receives funds under a program authorized by this Act." 20 U.S.C. § 7861(a).

Title I, Part A, of NCLB, titled "Improving Basic Programs Operated by Local Educational Agencies," continues to pursue the objectives of the ESEA and imposes extensive educational requirements on participating States and school districts, and, likewise, provides the largest amount of federal appropriations to participating States. For example, in fiscal year 2006, NCLB authorized $22.75 billion in appropriations for Title I, Part A, compared to $14.1 billion for the remaining twenty-six parts of NCLB combined. Title I, Part A's stated purposes include meeting "the educational needs of low-achieving children in our Nation's highest-poverty schools, limited English proficient children, migratory children, children with disabilities, Indian children, neglected or delinquent children, and young children in need of reading assistance." 20 U.S.C. § 6301(2).

In addition to Title I, Part A, NCLB establishes numerous other programs, including a literacy initiative for young children and poor families (Title I, Part B), special services for the education of children of migrant workers (Title I, Part C), requirements that all teachers be "highly qualified" (Title II, Part A), and instruction in English for children with limited English ability (Title III). Plaintiffs' complaint focuses on the educational requirements and funding provisions of Title I, Part A.

To qualify for federal funding under Title I, Part A, States must first submit to the Secretary a "State plan," developed by the State's department of education in consultation with school districts, parents, teachers, and other administrators. 20 U.S.C. § 6311(a)(1). A State plan must "demonstrate that the State has adopted challenging

academic content standards and challenging student academic achievement standards" against which to measure the academic achievement of the State's students. *Id.* § 6311(b)(1)(A). The standards in the State plan must be uniformly applicable to students in all of the State's public schools, and must cover at least reading or language arts; math; and, by the fourth grade, science skills. *Id.* § 6311(b)(1)(C).

States also must develop, and school districts must administer, assessments to determine students' levels of achievement under plan standards. *Id.* § 6311(b)(2)(A). These assessments must show the percentage of students achieving "proficiency" among "economically disadvantaged students," "students from major racial and ethnic groups," "students with disabilities," and "students with limited English proficiency." *Id.* § 6311(b)(2)(C)(v)(II). Schools and districts are responsible for making "adequate yearly progress" ("AYP") on these assessments, meaning that a minimum percentage of students, both overall and in each subgroup, must attain proficiency. 34 C.F.R. § 200.20(a)(1).

A school's failure to achieve AYP triggers other requirements of Title I, Part A. *See* 20 U.S.C. § 6316(b). If a school fails to make AYP for two consecutive years, it must be identified by the local educational agency for school improvement. 20 U.S.C. § 6316(b)(1)(A). Among other things, a school in improvement status must inform all of its students, including those who have been assessed as proficient, that they are permitted to transfer to any school within the district that has not been identified for school improvement. *Id.* § 6316(b)(1)(E)(i). The school also must develop a two-year plan setting forth extensive measures to improve student performance, including further education for teachers and possible before- or after-school instruction or summer instruction. *Id.* §§ 6316(b)(3)(A)(iii), (ix).

If a school does not achieve AYP after two years of improvement status, it is "identif[ied] . . . for corrective action." *Id.* § 6316(b)(7)(C)(iv). Corrective action involves significant changes, such as replacing teachers who are "relevant to the failure to make [AYP]," or instituting an entirely new curriculum. *Id.* § 6316(b)(7)(C)(iv)(I).

If, after a year of corrective action, a school still has not reached AYP, the district must restructure the school entirely; options for restructuring include "[r]eopening the school as a public charter school," replacing the majority of the staff, or allowing the State's department of education to run the school directly. *Id.* § 6316(b)(8)(B)(i).

The issue of who must pay to implement these requirements is the heart of this case. NCLB requires that States use federal funds made available under the Act "only to supplement the funds that would, in the absence of such Federal funds, be made available from non-Federal sources for the education of pupils participating in programs assisted under this part, and not to supplant such funds." 20 U.S.C. § 6321(b)(1). That is, States and school districts remain responsible for the majority of the funding for public education, and the funds distributed under Title I are to be used only to implement Title I programming, not to replace funds already being used for general programming.[2]

While Plaintiffs recognize that the majority of funding for education continues to come from state and local sources, they contend that NCLB does not require them to spend the money drawn from state and local sources on the additional programs required by NCLB. They point to § 7907(a), entitled "Prohibitions on Federal government and use of Federal funds," often referred to as the "Unfunded Mandates Provision," which provides that "[n]othing in this Act shall be construed to . . . mandate a State or any subdivision thereof *to spend any funds or incur any costs not paid for under this Act*. 20 U.S.C. § 7907(a) (emphasis added). Plaintiffs argue that this section specifically exempts them from complying with NCLB's requirements where federal funding does not cover the additional costs of complying with those requirements. They further note that former Secretary of Education Rod Paige has explained that "[t]here is language in the bill that prohibits requiring anything that is not paid for." (Pls.' Compl. for Declaratory and Injunctive Relief ("Compl.") 12; Joint Appendix ("JA") 21 (quoting Paige statement of Dec. 2, 2003).)

---

[2]Plaintiffs do not argue that the funds distributed by NCLB are a substitute for those funds that have historically come from state and local sources. Instead, Plaintiffs argue only that they should not be required to incur additional funding obligations to comply with NCLB when those obligations would not be incurred absent the State's attempt at NCLB compliance.

**B.      Procedural history**

Plaintiffs brought suit in the United States District Court for the Eastern District of Michigan seeking a declaratory judgment that NCLB does not require school districts to comply with the Act's educational requirements if doing so would require the expenditure of state and local funds to cover the additional costs of compliance.  In the alternative, the complaint alleged that the Act is ambiguous as to whether school districts are required to spend their own funds, and that imposing such a requirement would violate the Spending Clause.

Plaintiffs alleged that in the years following the enactment of NCLB, Congress has not provided States and school districts with sufficient federal funds to comply fully with the Act.  For example, for the five years from fiscal year 2002 to fiscal year 2006, Congress appropriated $30.8 billion dollars less for Title I grants to school districts than it authorized in NCLB.  (JA 27.)  Plaintiffs sought a declaratory judgment stating that "states and school districts are not required to spend non-NCLB funds to comply with the NCLB mandates, and that a failure to comply with the NCLB mandates for this reason does not provide a basis for withholding any federal funds to which they otherwise are entitled under the NCLB."  (JA 67.)  Plaintiffs also sought an injunction prohibiting the Secretary from "withholding from states and school districts any federal funds to which they are entitled under the NCLB because of a failure to comply with the mandates of the NCLB that is attributable to a refusal to spend non-NCLB funds to achieve such compliance."  (*Id.*)

The district court dismissed the complaint for failure to state a claim.  The court focused on the first part of § 7907(a), which, for clarity, we restate in full below:

> General prohibition.  Nothing in this Act shall be construed to authorize *an officer or employee* of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act.

20 U.S.C. § 7907(a) (emphasis added). The court concluded that "[b]y including the words 'an officer or employee of,' Congress clearly meant [merely] to prohibit federal officers and employees from imposing additional, unfunded requirements, beyond those provided for in the statute." *Sch. Dist. of Pontiac v. Spellings*, No. 05-CV-71535, 2005 U.S. Dist. LEXIS 29253, at *12 (E.D. Mich. Nov. 23, 2005). "This does not mean," the court explained, "that *Congress* could not [require States or school districts to spend any funds or incur any costs not paid for under this Act], which it obviously has done by passing the NCLB Act." *Id.* at *11. In other words, the district court read § 7907(a) merely to prohibit federal officers and employees from imposing requirements that were not authorized by the Act on States and school districts, and rejected Plaintiffs' argument that § 7907(a) excuses compliance with requirements of the Act that impose additional costs on the States not funded by the federal government.

Plaintiffs appealed. In a divided, published opinion, the panel below reversed the judgment of the district court. *Pontiac Sch. Dist. v. Sec'y of U.S. Dep't of Educ.*, 512 F.3d 252, 254 (6th Cir. 2008) (vacated). That decision found that Plaintiffs had standing to bring suit and that NCLB failed to provide clear notice to States as required by the Spending Clause. *Id.* at 259, 261. The panel majority concluded that based on the text of § 7907(a), NCLB failed to provide clear notice because a state official could plausibly conclude that the State need not comply with those NCLB requirements that were not covered by federal funding. *Id.* at 269.

On May 1, 2008, a majority of judges of this Court voted to rehear the case en banc, vacating the panel's opinion and restoring this case to the docket as a pending appeal.

## II.  DISCUSSION

### A.     Justiciability

A threshold question is whether this case is properly before us.  As we have previously explained, "[a] claim is not 'amenable to . . . the judicial process,' *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 102 [] (1998), when it is filed too early (making it unripe), when it is filed too late (making it moot) or when the claimant lacks a sufficiently concrete and redressable interest in the dispute (depriving the plaintiff of standing)." *Warshak v. United States*, 532 F.3d 521, 525 (6th Cir. 2008) (en banc).  This controversy implicates two of these doctrines—standing and ripeness.

#### 1.     Standing

First, we must decide whether Plaintiffs have standing to challenge NCLB under the Spending Clause.  We review the question of standing de novo.  *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004).  Plaintiffs, as the parties now asserting federal jurisdiction, have the burden of establishing standing. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 n.3 (2006).  To satisfy the constitutional requirement of standing,

> a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc.*, 528 U.S. 167, 180–81 (2000) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The injury suffered must be "an invasion of a legally protected interest." *United States v. Hays*, 515 U.S. 737, 743 (1995).  This tripartite standing requirement applies to claims under NCLB.  *See Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1157 (D.C. Cir. 2005) (citing *Lujan*, 504 U.S. at 560–61).

Here, because the district court dismissed the complaint at the pleading stage, the assessment of standing is confined to the allegations in the complaint. "At the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice"; more is required to defeat a motion for summary judgment, and even more is required for a decision on the merits. *Lujan*, 504 U.S. at 561.

We conclude that the school district Plaintiffs meet the three requirements for standing based on their allegation that they must spend state and local funds to pay for NCLB compliance. Since at least one Plaintiff in this action has standing, there is no need to consider whether the education association Plaintiffs also have standing. *See Clinton v. City of N.Y.*, 524 U.S. 417, 431 n.19 (1998); *Bowsher v. Synar*, 478 U.S. 714, 721 (1986). Additionally, we need not address whether the school district Plaintiffs' other alleged injuries are sufficient to establish standing. *See Nuclear Energy Inst., Inc. v. EPA*, 373 F.3d 1251, 1266 (D.C. Cir. 2004) (finding standing where, although one alleged injury might not occur "for thousands of years," another injury allegedly would occur very soon).

### a.      Injury in fact

School district Plaintiffs allege that they must spend state and local funds to pay for NCLB compliance:

> Because of the multi-billion dollar national funding shortfalls of NCLB, and the insistence by [the Secretary] that . . . school districts comply fully with all of the NCLB mandates imposed upon them even if NCLB funds that they receive are insufficient to pay for such compliance, . . . school districts have had and will have to spend a substantial amount of non-NCLB funds to comply with those mandates, diverting those funds from other important educational programs and priorities, such as programs for gifted and talented students, courses in foreign languages, art, music, computers, and other non-NCLB subjects, class size reduction efforts, and extracurricular activities.

(JA 61–62.) They also allege that if they do not comply with all NCLB requirements, the districts "face the withholding [by the Secretary] of federal funds to which they otherwise are entitled under the NCLB." (JA 65.) Additionally, the school district

Plaintiffs claim that inadequate federal funding has caused low rates of student proficiency on standardized tests.

The Secretary consistently has maintained that the school district Plaintiffs must comply with NCLB requirements even if they must spend non-federal funds to do so. School district Plaintiffs allege that the Secretary's insistence that school districts comply fully with NCLB has already forced them to spend state and local funds on NCLB requirements and will continue to require such expenditures in the future. Because this injury already has occurred and is ongoing, it is concrete and actual.

Moreover, the alleged ongoing need of school district Plaintiffs to spend non-federal funds to comply with NCLB requirements is not dependent on the hypothetical actions of "decisions made by the appropriate [state] authorities, who are not parties to this case." *Warth v. Seldin*, 422 U.S. 490, 509 (1975) (holding that city of Rochester taxpayers could not sue the town of Penfield on the theory that Penfield's zoning practices would increase Rochester taxes, because Rochester was not a party). That is, under NCLB, States do not have the discretion to decide that, in the event of a federal-funding shortfall, some districts will continue to receive their previous level of funding and others will not. Instead, under NCLB, state departments of education "shall" allocate federal NCLB funds to counties or school districts based on formulas provided in NCLB and approved by the Secretary. 20 U.S.C. § 6333(a)(3)(C). Thus, the "injury in this case . . . does not turn on the independent actions of third parties," but on NCLB's funding requirements, which dictate the quantum of funding provided to each school district. *Clinton*, 524 U.S. at 431 n.19. To the extent the funding received by the school district Plaintiffs under NCLB is insufficient to defray the cost of compliance with NCLB requirements, the districts have sustained a cognizable injury in fact.

> b.       *Traceability*

School district Plaintiffs' obligation to spend non-federal funds to comply with NCLB is traceable to the challenged action of the Secretary. The Secretary has interpreted NCLB to mean that "'[i]f a state decides to accept the federal funds [offered

under the NCLB], then it's required to implement the law in its entirety.'" (Compl. 12; JA 21 (quoting Rodney Paige, Sec'y, U.S. Dep't of Educ., Remarks to National Urban League (Mar. 25, 2004)) (alterations in original).) And, the Secretary has not granted waivers of NCLB educational requirements based on the insufficiency of federal funding.[3] Therefore, school district Plaintiffs alleged that the spending of non-federal funds to comply with NCLB requirements is directly traceable to the Secretary's interpretation of NCLB.

### c.    *Redressability*

Finally, school district Plaintiffs' injury must be redressable by a favorable decision. Among other relief, Plaintiffs seek a declaratory judgment that "school districts are not required to spend non-NCLB funds to comply with the NCLB mandates." (JA 67.) Such a judgment would forbid the Secretary from requiring the expenditure of non-federal funds on NCLB compliance. This would redress the injury alleged by Plaintiffs.

### 2.    *Ripeness*

Next, we must decide whether Plaintiffs' challenge to NCLB is ripe for judicial review. This Court reviews questions of ripeness de novo. *Ammex, Inc. v. Cox*, 351 F.3d 697, 706 (6th Cir. 2003). "In ascertaining whether a claim is ripe for judicial resolution, we ask two basic questions: (1) is the claim 'fit[] . . . for judicial decision' in the sense that it arises in a concrete factual context and concerns a dispute that is likely to come to pass? and (2) what is 'the hardship to the parties of withholding court consideration'?" *Warshak*, 532 F.3d at 525 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)) (alternations in original).

---

[3] Plaintiffs allege that "it would be futile for the plaintiff school districts to ask" for a waiver because of the Secretary's uniform rejection of requests for waivers. (JA 22–23.) The Secretary does not dispute that a request would be futile. Moreover, even if the Secretary granted waivers for the Plaintiffs here, it would not change this Court's Spending Clause analysis, nor would it protect other school districts that may not be granted waivers in the future.

This case is ripe for judicial review. In discussing ripeness, this Court aptly has provided both that "the basic rationale of the ripeness doctrine 'is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements,'" *Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 284 (6th Cir. 1997) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580 (1985)), and that "[r]ipeness becomes an issue when a case is anchored in future events that may not occur as anticipated, or at all." *Id*. (citations omitted). These concerns are not present here. The question before this Court is neither abstract nor hypothetical. Plaintiffs present a straightforward, concrete question of statutory interpretation, the answer to which is not dependent on further development of facts or further administrative action. *See Warshak*, 532 F.3d at 528 (explaining that legal questions that are answered "differently in different settings" lack fitness for review). In short, unless we decide this matter, school district Plaintiffs will be forced to continue expending limited state resources to comply with NCLB.

### a. Fitness

There is no doubt that Congress has not fully funded the cost of complying with NCLB, and school district Plaintiffs assert that they are forced to spend non-federal monies to comply with NCLB—meaning this dispute over school funding is unquestionably "likely to come to pass." Plaintiffs assert that they already have suffered injury in the expenditure of non-refundable, non-federal dollars in pursuit of compliance with the NCLB. Thus, we need not concern ourselves with the hypothetical, as Plaintiffs are prepared to establish actual ongoing harm.

Similarly, Plaintiffs have demonstrated that their claims arise in a concrete factual context. Simply, we are asked whether under the plain language of NCLB, when the Act is considered in parallel with the Spending Clause, the Secretary may require States to expend non-federal monies. We are not being asked to invalidate the law or to apply NCLB to any particular set of factual circumstances in which we would benefit from further administrative developments. We must decide only—through traditional

techniques of statutory interpretation—whether NCLB complies with the clear-notice requirements of the Spending Clause.

### b.     Hardship

This dispute falls within the traditional conception of a "hardship" case—namely, a "claimant who faces a choice between immediately complying with a burdensome law or 'risk[ing] serious criminal and civil penalties.'" *Warshak*, 532 F.3d at 531 (quoting *Abbott Labs.*, 387 U.S. at 149) (alterations in original).

We see no reason to depart from the jurisprudence that "where a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs with serious penalties attached to noncompliance, hardship has been demonstrated." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 743–44 (1997) (internal quotation marks omitted). Here, school district Plaintiffs must decide between drastic budget reallocation to comply with NCLB and serious statutory consequences, including teacher replacement, school restructuring, school closure and reopening as a charter school, or having schools run by the State's department of education. *See* 20 U.S.C. §§ 6316(b)(7)(C)(iv), (b)(8)(B).

## B.     Federal Rule of Civil Procedure 19

My colleague Judge McKeague argues that this case must be dismissed under Federal Rule of Civil Procedure 19 because absent parties are necessary to this litigation. McKeague Op. 73–86. Specifically, Judge McKeague contends that the States of Michigan, Texas, and Vermont are required parties to this litigation incapable of joinder and that any relief granted in their absence would be incomplete. McKeague Op. 76–80. However, this reasoning is not supported by the text of Rule 19 or the relevant case law. Moreover, such a broad interpretation of Rule 19 could have the undesirable effect of foreclosing a vast category of legitimate challenges to federal laws.

### 1.    *The text of Rule 19*

Under Federal Rule of Civil Procedure 19, "whether a party is indispensable for a just adjudication requires a determination regarding whether the absent party is necessary to the litigation; if so, whether the absent party can be joined in the litigation; and if joinder is infeasible, whether the lawsuit can nevertheless proceed 'in equity and good conscience.'" *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1494 (D.C. Cir. 1995) (quoting former Fed. R. Civ. P. 19 and citing *W. Md. Ry. Co. v. Harbor Ins. Co.*, 910 F.2d 960, 961 (D.C. Cir. 1990)).  An absent party is required for a litigation if:

> (A) in [the party's] absence, the court cannot accord complete relief among existing parties; or
>
> (B) that [party] claims an interest relating to the subject of the action and is so situated that disposing of the action in the [party's] absence may:
>
>> (i) as a practical matter impair or impede the [party's] ability to protect the interest; or
>>
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).  If an absent required party cannot be joined in the lawsuit, Rule 19 provides that:

> the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
>
>> (1) the extent to which a judgment rendered in the [party's] absence might prejudice that [party] or the existing parties;
>>
>> (2) the extent to which any prejudice could be lessened or avoided by:
>>
>>> (A) protective provisions in the judgment;
>>>
>>> (B) shaping the relief; or
>>>
>>> (C) other measures;
>>
>> (3) whether a judgment rendered in the [party's] absence would be adequate; and

> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder.

Fed. R. Civ. P. 19(b).  Our analysis involves two steps: first, we must examine whether the States of Michigan, Texas, and Vermont (the "States") are required parties; second, we must determine whether, in their absence, equity and good conscience require the case to be dismissed.  If the answer to either question is no, then Rule 19 does not foreclose this litigation.

Under Rule 19(a), we first determine whether this Court can "accord complete relief among existing parties" in the States' absence.  Fed. R. Civ. P. 19(a)(1)(A).  "Completeness is determined on the basis of those persons who are already parties, and not as between a party and the absent person whose joinder is sought." *Angst v. Royal Maccabees Life Ins. Co.*, 77 F.3d 701, 705 (3d Cir. 1996) (citing *Sindia Expedition, Inc. v. Wrecked & Abandoned Vessel*, 895 F.2d 116, 121 (3d Cir. 1990) and quoting 3A *Moore's Federal Practice* 19.07-11 at 93–98 (2d ed. 1989) (internal quotations omitted in original)); *see also United States v. County of Arlington*, 669 F.2d 925, 929 (4th Cir. 1982); *Eldredge v. Carpenters 46 N. Cal. Counties Joint Apprenticeship & Training Comm.*, 662 F.2d 534, 537 (9th Cir. 1981).  Here, neither Plaintiffs nor the Secretary would receive incomplete relief without the States as parties.  As will be discussed in detail below, the issue arising between Plaintiffs and the Secretary is whether NCLB provides the clear notice required under the Spending Clause.  If NCLB fails to provide clear notice, this Court may uphold the Plaintiffs' interpretation of § 7907(a), thus preventing the forced expenditure of non-NCLB funds.  If NCLB provides clear notice, this Court may uphold the Secretary's interpretation.  Such declaratory relief for either side is complete relief and does not require joinder of the States.

While it is true that both statewide plans and district plans may need to be amended following the disposition of this case, NCLB itself contemplates periodic review of these plans and the submission of revisions to the Secretary as necessary. *See* 20 U.S.C. § 6311(a), (f).  Such administrative actions have no bearing on the completeness of the requested declaratory relief.  Moreover, even if some future

litigation were likely between Plaintiffs or the Secretary and the States, the "possibility that the successful party to the original litigation would have to defend its rights in a subsequent suit by the [absent party] does not make it a necessary party to the action." *Angst*, 77 F.3d at 705 (citing *Sindia*, 895 F.2d at 122); *see also MasterCard Int'l, Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 385 (2d Cir. 2006) ("While there is no question that further litigation [involving an absent party] is inevitable if MasterCard prevails in this lawsuit, Rule 19(a)(1) is concerned only with those who are already parties."); *LLC Corp. v. Pension Benefit Guar. Corp.*, 703 F.2d 301, 305 (8th Cir. 1983) (determining that Rule 19(a)(1)(A) applies to current parties, "not [to] the speculative possibility of further litigation between a party and an absent person"). "Rule 19 calls for a pragmatic approach; simply because some forms of relief might not be available due to the absence of certain parties, the entire suit should not be dismissed if meaningful relief can still be accorded." *Smith v. United Bhd. of Carpenters & Joiners of Am.*, 685 F.2d 164, 166 (6th Cir. 1982); *see also Bank of Am. Nat'l Trust & Sav. Ass'n v. Hotel Rittenhouse Assocs.*, 844 F.2d 1050, 1054 n.5 (3d Cir. 1988) ("We observe that the advisory committee note to Rule 19(a) indicates that the question of 'complete relief' may not denote final adjudications of all claims between the parties, so long as the relief actually afforded to the parties in the action is meaningful."). Regardless of the presence or absence of Michigan, Texas, or Vermont in this case, the declaratory relief this Court can provide is meaningful and complete, and we thus conclude that the States are not required parties under 19(a)(1)(A).

Notwithstanding this determination, the States still may be required under Rule 19(a)(1)(B). Rule 19(a)(1)(B)(i) exists to protect absentee parties, asking the Court to consider whether disposing of the matter in the parties' absence would "impair or impede the [parties'] ability to protect the interest." Fed. R. Civ. P. 19(a)(1)(B)(i). We find that resolving this dispute does not impair or impede such an interest. First, the States do not have an obvious interest in this dispute that requires protection. In general, under NCLB, the States act as intermediaries through which federal funds flow to local schools to fund NCLB initiatives. Accordingly, the States' interests do not readily align

with either the Plaintiffs' or the Secretary's interpretation of NCLB in this Spending Clause dispute. Because no party has articulated an interest unique to the States and because we are disinclined to speculate as to the existence of such interests, there simply is no basis on which to find that the States possess an interest requiring its participation.

Second, even if the States have a particular interest in this dispute, they had the opportunity to intervene to protect that interest but declined to participate. Had Michigan, Texas, or Vermont sought intervention, there is little doubt that this Court would have allowed each State to join as an intervenor. *See Jansen v. City of Cincinnati*, 904 F.2d 336, 342 (6th Cir. 1990) ("We join other circuits in holding that the possibility of adverse stare decisis effects provides intervenors with sufficient interest to join an action."). Moreover, the States could have provided the Court with arguments as to their interests without jeopardizing sovereign immunity by appearing as amici curiae. However, it would turn Rule 19 analysis on its head to argue that the States' interests are now impaired because they declined to participate in this much-publicized case.[4]

Last, we believe that the States' interests, if they have any, are adequately represented by the existing parties. *See Republic of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2189 (2008) (stating that parties "are required entities because [w]ithout them . . . their interests in the subject matter are not protected") (alterations in original); *see also Ohio Valley Envtl. Coal. v. Bulen*, 429 F.3d 493, 504–05 (4th Cir. 2005) (determining that absentees were not necessary parties when their interests were identical to those of existing parties who were capable of adequately representing the absentees' interests); *Washington v. Daley*, 173 F.3d 1158, 1167–68 (9th Cir. 1999) (concluding, in a challenge to fishing regulations, that the United States adequately represented tribes who were, therefore, not necessary parties); *see also Rochester Methodist Hosp. v. Travelers Ins. Co.*, 728 F.2d 1006, 1016 (8th Cir. 1984) (reasoning that the Department of Health & Human Services ("HHS") was not a necessary party

---

[4]In fact, several States did participate in this lawsuit as amici curiae. See Amici Curiae Br. of the States of Connecticut, Delaware, Illinois, Maine, Oklahoma, Wisconsin, and the District of Columbia (filed Apr. 3, 2006); Amicus Curiae Br. of the Governor of the Commonwealth of Pennsylvania (filed Apr. 6, 2006).

under Fed. R. Civ. P. 19(a)(1)(B)(i) because its interests were adequately protected by the United States Attorney who would make "every argument that HHS would or could make"). For these reasons, the States are not required parties under Rule 19(a)(1)(B)(i).

Finally, in examining if the States are required parties under the text of Rule 19, we must consider whether disposing of this action without the States would "leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest." Here, no such risk exists. In fact, the opposite is true. Judicial economy is served, and the threat of inconsistent obligations is reduced, by deciding the present controversy because the existing parties as well as absent parties then will be aware of their rights and responsibilities under NCLB. Thus, under Rule 19(a)(1)(B)(ii), we conclude that the States are not required parties.

### 2.     *Relevant Rule 19 case law*

There is little precedent supporting the broad reading of Rule 19 urged by my colleague. In the closest case, *Kickapoo Tribe*, the D.C. Circuit concluded that Kansas was an indispensable party under Rule 19 and remanded to the district court with instructions to dismiss the case. 43 F.3d at 1500. The lawsuit filed by the Kickapoo Tribe against the Secretary of the Interior sought to invalidate a compact approved by the Secretary under the Indian Gaming Regulatory Act ("Gaming Act"). *Id*. at 1493–94. However, that case presented an entirely different challenge from the one at hand. Rather than challenging the federal Gaming Act, the Kickapoo Indians challenged a compact made between the Kickapoo Indians and the State of Kansas, and the case involved a question of the Kansas Governor's authority under Kansas law to sign the compact. *Id*. at 1494. There, it was clear that Kansas had an interest both in the compact and in the Governor's authority under Kansas law. Here, the States possess no similar interest in the interpretation of NCLB, nor is there any challenge to the States' authority to administer their educational programs under state law. With *Kickapoo Tribe* distinguished, there is no support for extending Rule 19 to the case before us. In fact,

we are unable to find a single case in which a court of appeals has dismissed a challenge to the interpretation of a federal statute because a relevant State could not be joined.

On the other hand, many federal laws requiring state administration and implementation have been challenged without participation by the relevant States. For example, the recent Supreme Court cases of *Forest Grove School District v. T.A.*, No. 08-305, 2009 U.S. LEXIS 4645 (June 22, 2009), *Winkelman v. Parma City School District*, 550 U.S. 516 (2007), and *Arlington Central School District Board of Education v. Murphy*, 548 U.S. 291 (2006), all involved challenges similar to this case (albeit to the Individuals with Disabilities Education Act ("IDEA")), in which, as Judge McKeague acknowledged, the Court "issued holdings that were not only binding on the parties, but also, for all practical purposes, binding as precedent on the respective States" yet none of those cases was dismissed under Rule 19. McKeague Op. 84. Similarly, the Supreme Court has decided environmental cases involving challenges to the interpretation of federal statutes administered, in part, by the States without requiring state participation. *See, e.g.*, *Envtl. Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) (interpreting the federal Clean Air Act without North Carolina's participation); *S. Fla. Water Mgmt. Dist. v. Miccosukee Tribe of Indians*, 541 U.S. 95 (2004) (interpreting the federal Clean Water Act without Florida's participation). Thus, under Rule 19, a State's participation is not required simply because the case's outcome might affect the State.

    *3.    Policy*

To hold that Rule 19 requires the States' joinder in this case would greatly expand the class of required or necessary parties under the Rule. Making the States required parties in this litigation and ultimately dismissing this action would have the undesirable effect of foreclosing a vast category of challenges to federal laws—namely, any challenge to a federal statute where a State plays a role in the administration of the statute and possesses an interest in its administration, but chooses not to join the lawsuit. Under my colleague's reasoning, all pending and future NCLB and IDEA challenges in this Circuit would be foreclosed. Such an interpretation would also provide strong

precedent for the dismissal of pending and future challenges regarding environmental, transportation, and other Spending-Clause suits, if the relevant States choose not to participate. This cannot be the intended purpose or effect of Rule 19.

While the States may have an interest in the outcome of this case, that is not enough. To be considered required parties, Michigan, Texas, and Vermont must fall within either of Rule 19's two categories. They do not. The States are simply not required parties under Rule 19, and their joinder is unnecessary for the continuation of this lawsuit.

## C.    The clear-notice requirement under the Spending Clause

Under the Spending Clause, "Congress has broad power to set the terms on which it disburses federal money to the States." *Arlington*, 548 U.S. at 296 (citing *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)). "[B]ut when Congress attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Id.* (citing *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) and *Bd. of Educ. v. Rowley*, 458 U.S. 176, 204 n.26 (1982)). Legislation enacted under "'the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* (quoting *Pennhurst*, 451 U.S. at 17). "By insisting that Congress speak with a clear voice," the Supreme Court enables States "to exercise their choice knowingly, cognizant of the consequences of their participation." *Pennhurst*, 451 U.S. at 17. Moreover, "in those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Id.* at 17–18.

In *Pennhurst*, the Supreme Court applied these principles to conclude that States participating in the Developmentally Disabled Assistance and Bill of Rights Act of 1975 ("DDA"), 42 U.S.C. §§ 6000–81, were not required to assume the costs of providing

certain treatment and services to mentally disabled citizens. 451 U.S. at 5. The DDA provided financial assistance to participating States to aid them in creating programs to care for and treat the mentally disabled. *Id.* at 11. The DDA also included a variety of requirements for the receipt of federal funds, such that the States submit a plan to the Secretary of the Department of Health and Human Services to evaluate the services provided under the DDA. *Id.* at 12. At the heart of the case was the DDA's "bill of rights" provision, which provided that mentally disabled citizens "have a right to appropriate treatment, services, and habilitation for such disabilities" to be provided "in the setting that is least restrictive of the person's personal liberty." *Id.* at 13. The plaintiffs, certain disabled citizens of Pennsylvania (a participant in the DDA), sued their state-owned institution to enforce these "rights"; that is, to compel Pennsylvania to pay for the costs of the services promised by the "bill of rights." *Id.*

The Supreme Court held, however, that the language in the DDA's "bill of rights" provision did not create enforceable obligations on the State. *Id.* at 22. The Court explained that the provision's terms, "when viewed in the context of the more specific provisions of the Act, represent general statements of federal policy, not newly created legal duties." *Id.* at 22–23. The Court also noted that the Act's "plain language" supported this view. *Id.* at 23. It stated that "[w]hen Congress intended to impose conditions on the grant of federal funds," as it did in other sections of the DDA, "it proved capable of doing so in clear terms," by, for example, using the term "conditioned." *Id.* The "bill of rights" section, "in marked contrast, in no way suggest[ed] that the grant of federal funds [was] 'conditioned' on a State's funding the rights described therein." *Id.* The Court further explained that the federal Government had no authority under the DDA to withhold funds from States for failing to comply with the "bill of rights" section. *Id.* Accordingly, that section could "hardly be considered a 'condition' of the grant of federal funds." *Id.* The Court also explained that the funds Congress provided to Pennsylvania under the DDA were "woefully inadequate to meet the enormous financial burden of providing 'appropriate' treatment in the 'least restrictive' setting." *Id.* at 24. This confirmed that "Congress must have had a limited

purpose in enacting" this provision because Congress "usually makes a far more substantial contribution to defray costs" when it "impose[s] affirmative obligations on the States." *Id.* "It defies common sense," the Court reasoned, "to suppose that Congress implicitly imposed this massive obligation on participating States."[5] *Id.*

The Court reiterated that "Congress must express clearly its intent to impose conditions on the grant of federal funds so that the States can knowingly decide whether or not to accept those funds." *Id.* "That canon," the Court continued, "applies with greatest force where, as here, a State's potential obligations under the Act are largely indeterminate." *Id.* "The crucial inquiry, however, is not whether a State would knowingly undertake that obligation, but *whether Congress spoke so clearly that we can fairly say that the State could make an informed choice.*" *Id.* at 25 (emphasis added). Thus, the Court concluded that "Congress fell well short of providing clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" the "bill of rights" provision in the DDA. *Id.*

The Supreme Court applied these principles again in *Arlington*, where a similar question arose under the IDEA, 20 U.S.C. § 1400 et. seq. *Arlington*, 548 U.S. at 296–300. Enacted under the Spending Clause, the IDEA "provides federal funds to assist state and local agencies in educating children with disabilities and conditions such funding upon a State's compliance with extensive goals and procedures." *Id*. at 295 (internal quotation marks and citation omitted). The plaintiffs in *Arlington* sued under the IDEA on behalf of their son to require the Arlington Board of Education to pay for their son's private-school tuition for specified school years. *Id.* at 294. The plaintiffs prevailed in the district court, and the Second Circuit affirmed. *Id*. As the prevailing parties, the plaintiffs then sought fees for the services of an educational consultant who assisted them throughout the litigation. *Id.* Central to the dispute in *Arlington* was the IDEA's provision that a court "'may award reasonable attorneys' fees as part of the

---

[5]In this case, Plaintiffs do not dispute that Congress did clearly intend to place conditions on the grant of federal funds. However, there is no mention of the cost of compliance anywhere in the text of NCLB. Plaintiffs argue that Congress's silence cannot be interpreted as a clear statement that States and local governments would be required to spend their own funds to cover any shortfall of federal funds.

costs'" to parents who prevail in an action brought under the Act. *Id.* at 297 (quoting 20 U.S.C. § 1415(i)(3)(B)).

Noting that "resolution of the question presented in this case is guided by the fact that Congress enacted the IDEA pursuant to the Spending Clause," the Supreme Court ultimately held that the plaintiffs were not entitled to the expert fees requested. *Id.* at 295. The Court reaffirmed *Pennhurst*'s principle requiring clear notice to States of their obligations under such legislation and explained how that principle should be applied: The Court "must view the IDEA from the perspective of a state official who is engaged in the process of deciding whether the State should accept IDEA funds and the obligations that go with those funds." *Id.* The Court "must ask whether such a state official would clearly understand that one of the obligations of the Act is the obligation to compensate prevailing parents for expert fees." *Id.* "In other words," the Court continued, "we must ask whether the IDEA furnishes clear notice regarding the liability at issue in this case." *Id.*

Applying these principles, the Court first considered the text of the IDEA. *Id.* The Court noted that it has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Id.* (internal quotation marks and citation omitted). The Court then explained that, although the IDEA fee provision "provides for an award of 'reasonable attorneys' fees,' this provision does not even hint that acceptance of IDEA funds makes a State responsible for reimbursing prevailing parents for services rendered by experts." *Id.* at 297. Accordingly, the Court rejected the plaintiffs' argument that, because expert fees amounted to "costs" in IDEA proceedings and because the provision allowed for reasonable attorneys' fees "as part of the costs," the plaintiffs were entitled to expert fees. *Id.* at 297–98. The Court explained that the provision "certainly fails to provide the clear notice that is required under the Spending Clause." *Id.* at 298. The Court then explained that other provisions of the IDEA supported this view of the text. *Id.* at 298–301. For example, the IDEA includes detailed provisions to ensure that attorneys' fees are reasonable, but lacks comparable provisions regarding expert fees. *Id.* at 298.

Additionally, the Court concluded that its holding was consistent with prior cases addressing the definitions of costs and fees. *Id.* at 301–02.

The Court remained unswayed in this conclusion even in light of evidence that Congress intended the opposite interpretation of the expert-fees provision. The plaintiffs noted that Congress approved a Conference Report stating that "[t]he conferees intend[ed] that the term 'attorneys' fees as part of the costs' include[s] reasonable expenses and fees of expert witnesses . . . ." *Id.* at 304 (quoting H.R. Conf. Rep. No. 99-687, at 5 (1986)). "No Senator or Representative voiced *any* opposition to this statement in the discussion preceding the vote on the Conference Report—the last vote on the bill before it was sent to the President." *Id.* at 309 (Souter, J., dissenting). The Court responded that, "[u]nder these circumstances, where everything other than the legislative history overwhelmingly suggests that expert fees may not be recovered, the legislative history is simply not enough." *Id.* at 304. "In a Spending Clause case, the key is not what a majority of the Members of both Houses intend but *what the States are clearly told* regarding the conditions that go along with the acceptance of those funds." *Id.* (emphasis added). This legislative history, therefore, was not "sufficient to provide the requisite fair notice" that States bore this liability under the IDEA. *Id.*; *but see id.* at 309 (Souter, J., dissenting) ("I can find no good reason for this Court to interpret the language of this statute as meaning the precise opposite of what Congress told us it intended.").

**D.    NCLB**

*1.    Text of the Act*

We must view NCLB from the perspective of a state official who is engaged in the process of deciding whether the State should accept NCLB funds and the obligations that accompany those funds. *See Arlington*, 548 U.S. at 295. In other words, we must determine whether NCLB furnishes clear notice to the official that her State, if it chooses to participate, will have to pay for any additional costs of implementing the Act that are not covered by the federal funding provided for under the Act. In examining NCLB,

"we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy," *Pennhurst*, 451 U.S. at 18 (citations and internal quotations omitted), however, "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (citations omitted). "Indeed, in those instances where Congress has intended the States to fund certain entitlements as a condition of receiving federal funds, it has proved capable of saying so explicitly." *Pennhurst*, 451 U.S. at 17–18 (citation omitted). Here, no such provision exists. NCLB simply does not include any specific, unambiguous mandate requiring the expenditure of non-NCLB funds. Neither Judge McKeague, Judge Sutton nor the parties set forth any provision of NCLB that explicitly spells out the States' fiduciary obligations under this Act. To the contrary, § 7907(a) of NCLB provides that "[n]othing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act." Based on this provision, a state official likely would reach the opposite conclusion—namely, that her State would not be forced to provide funding for NCLB requirements for which federal funding falls short. Thus, we conclude a state official would not clearly understand that accepting federal NCLB funds meant agreeing to use state and local funds to meet goals rendered otherwise unreachable by deficient federal funding.

This is not to say that the Secretary's interpretation of the Act is frivolous. But the only relevant question is whether the Act provides *clear notice to the States* of their obligation. *See Arlington*, 548 U.S. at 296. With this rule in mind, we turn to the various interpretations of the text offered by the parties and explain why we are not persuaded that the States' funding obligations are clear.

### 2.    *Plaintiffs' interpretation*

Plaintiffs argue that the plain language of § 7907(a) excuses them from paying for the costs of compliance with NCLB that exceed those covered by federal funding. *See Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 252 (2004)

("Statutory construction must begin with the language employed by Congress and the assumption that the ordinary meaning of that language accurately expresses the legislative purpose." (internal quotation marks omitted)).  For convenience, the language of § 7907(a) is as follows:

> General prohibition. Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to *spend any funds or incur any costs not paid for under this Act*.

20 U.S.C. § 7907(a) (emphasis added).  The operative language under the Plaintiffs' reading of § 7907(a) is: "Nothing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act."  Read in this way, the clause exempts Plaintiffs from any costs that exceed federal funds.

Admittedly, there are problems with this interpretation.  First, § 7907(a)'s placement within the statute weakens Plaintiffs' argument.  Located in a section entitled, "Prohibitions on Federal Government and use of Federal funds," § 7907(a) is followed by three additional prohibitions:  "Prohibition on endorsement of curriculum," "Prohibition on requiring Federal approval or certification of standards," and a prohibition on "mandat[ing] national school building standards."  20 U.S.C. § 7907(b), (c), and (d).  These provisions expressly prohibit federal officials from imposing on States certain *additional* conditions to the requirements of NCLB.  Because agencies generally have broad power to interpret and administer law, this section might be concerned with preventing federal commandeering of state officials as well as limiting agency authority in administering NCLB.

Interpreted in this way, the first clause of § 7907(a) prohibits federal officers or employees from commandeering the state educational system.  20 U.S.C. § 7907(a) ("Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or

school's curriculum, program of instruction, or allocation of State or local resources
. . . ."). Like the other subsections of § 7907, § 7907(a) arguably could be concerned
with preventing the imposition of *additional* costs on states. Instead of prohibiting
states from bearing *any* costs of compliance, the second clause may prohibit *additional*
impositions on a State that are not agreed to by the State or set forth in NCLB. In other
words, Congress may have intended to prohibit the expansion of any of the requirements
under NCLB to micro-manage state officials in any way not expressly provided for
under NCLB.

Second, while the Plaintiffs provide strong evidence that many States and indeed
the former Secretary interpreted NCLB not to impose costs exceeding federal funding,[6]
their interpretation ignores the history of education funding, which suggests that
Congress did not intend to fund all aspects of compliance with NCLB. The prior panel's
dissent noted as much: "The notion that Congress intended to pay in full for a testing
and reporting regime of indeterminate cost, designed and implemented by States and
school districts, not federal agencies, is not only nonsensical and fiscally irresponsible,
but also contravenes the traditional recognition of state and local governments' primary
responsibility for public education." *Pontiac Sch. Dist.*, 512 F.3d at 277 (McKeague,
J., dissenting). Certainly, the history of education funding cuts against Plaintiffs'
reading of § 7907(a) that Congress intended to exempt States from the costs of
compliance with NCLB.

    *3.      The Secretary's interpretations of the text*

Two other interpretations of § 7907(a) have been advanced in this case, both of
which—if Congress had clearly expressed them—would counter Plaintiffs' argument
that § 7907(a) exempts the States from covering the costs of NCLB compliance in excess
of federal funding. The first, which the district court adopted, is that this section merely

---

[6]Former Secretary of Education Rod Paige described the Act as "contain[ing] language that says
things that are not funded are not required." (Compl. 11; JA 20.) He later emphasized that "if it is not
funded, it's not required. There is language in the bill that prohibits requiring anything that is not paid
for." (Compl. 12; JA 21.)

prevents officers and employees of the federal government from imposing additional, unauthorized requirements on the participating States.  The second is that this section simply emphasizes that state participation in NCLB is entirely voluntary, but that once a State chooses to participate, it must comply fully with NCLB requirements regardless of whether federal funding is adequate to cover the cost of compliance.  As discussed below, neither of these interpretations is self-evident.

### a.     *Stopping rogue federal officers or employees*

The view that § 7907(a) simply restricts federal officials from imposing additional requirements—that is, those not authorized by the Act—on participating States arises from the first part of § 7907(a), which discusses "an officer or employee of the Federal Government."  This reading interprets the Act to preclude any such officer or employee from mandating that a State incur costs not paid for under (that is, costs not authorized by) the Act:

> General prohibition.  *Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to* mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or *mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act*.

20 U.S.C. § 7907(a) (emphasis added).

In accepting this interpretation, the district court explained, the "[d]efendant argues convincingly that this sentence simply means no federal 'officer or employee' can require states or school districts to 'spend any funds or incur any costs not paid for under this Act.'"  *Pontiac*, 2005 U.S. Dist. LEXIS 29253, at *11.  The court further explained that, "[b]y including the words 'an officer or employee of,' Congress clearly meant to prohibit federal officers and employees from imposing additional, unfunded requirements, beyond those provided for in the statute."  *Id.* at *12.  In sum, the court concluded that § 7907(a) merely prevents rogue officers from imposing requirements not authorized by the Act.  There are two problems with this interpretation.

First, it is not evident that the "officer or employee" language modifies the final clause of § 7907(a) discussing incurring costs under the Act.  In other words, the "officer or employee" language reasonably can be read to modify only the middle clause regarding state and local control over curricula, as follows:  "Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources . . . ."  20 U.S.C. § 7907(a).  Under this reading, the final clause is modified by the opening clause:  "Nothing in this Act shall be construed to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act."  *Id*.  In this way, the Act prevents federal officers from controlling school curricula and allocations of local funds, but says nothing about officers mandating States to spend funds or incur costs for unauthorized obligations.

Second, if the "officer or employee" language is interpreted to modify the final clause, more fundamental problems emerge.  For one, such a reading would require us to substitute words that are not in the statutory text ("Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to . . . mandate a State or any subdivision thereof to spend any funds or incur any costs not [*authorized under this Act*]") for words that are in the text (". . . or incur any costs *not paid for under this Act*").  Stating that a federal officer cannot require a State to incur any costs "not paid for" under the Act is, to say the least, is an unusual way of saying that an officer cannot require a State to incur costs for something that is not *authorized* under the Act.  Were Congress truly concerned about this sort of ultra vires conduct by federal officers and employees, it could have said so expressly.  Even if this were Congress's concern, we would be left with the following tautology: This Act does not authorize federal officers or employees to require States to incur costs for anything that the Act does not authorize.

### b. *Emphasizing that participating in the Act is voluntary*

The Secretary also contends that the reference in the final clause of § 7907(a) to a State's costs under the Act simply emphasizes that a State's decision to accept federal funding under NCLB is entirely voluntary. The Secretary notes that this section provides limits on what the Act (or, if one accepts the reading discussed above, on what federal officers and employees) can "mandate" the States to do:

> General prohibition. Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to *mandate*, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or *mandate* a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act.

20 U.S.C. § 7907(a) (emphasis added). The Secretary argues that Congress fully understood that a statute, such as NCLB, that imposes conditions on a receipt of federal funds is not a mandate. Rather, the section is intended to clarify that States would not be subject to requirements that formed no part of the conditions set out in the statute. To support this reading, the Secretary notes that the Unfunded Mandates Act ("UMA"), 2 U.S.C. § 658(5)(A)(i)(II), defines "federal intergovernmental mandate" to exclude voluntary participation in federal programs. This reading is also flawed.

Plaintiffs do not contend that NCLB—as a whole—is an unfunded mandate forced upon the States. They appear willing to concede that NCLB is a voluntary program, and, therefore, their argument focuses on § 7907(a), not on the UMA.[7] Plaintiffs argue that, now that they are participating in NCLB, the Secretary is imposing (that is, "mandating") liabilities that they did not bargain for—and that are expressly prohibited by § 7907(a)—when they signed onto NCLB. There are at least three

---

[7]The amici question, however, whether a State can, as a practical financial matter, refuse federal funding under NCLB. *See, e.g.*, Amicus Curiae Br. of the Governor of the Commonwealth of Pennsylvania at 20 (noting that "states have come to depend upon [federal] funds to provide extra assistance to students who are economically and academically disadvantaged" and that "states are coerced to accept additional and financially burdensome requirements, so that they may continue to provide services and programs that they have offered to their neediest students for years"); *see also New York v. United States*, 505 U.S. 144, 175 (1992) (noting in another context that "Congress has crossed the line distinguishing encouragement from coercion").

additional reasons why § 7907(a) should not be read to merely emphasize the voluntariness of the program.

First, it is not apparent that § 7907(a) addresses States' voluntary participation in NCLB as opposed to their obligations after they have agreed to participate. The Secretary's reading would be easier if the Act stated that nothing in it shall be construed to mandate a State to "comply with the Act" or that nothing in the Act shall be construed to mandate a State to "incur any costs under this Act"—language like that would indicate that States can choose not to comply with the Act altogether. Instead, the text provides that nothing in the Act shall be construed to mandate a State to "incur any costs *not paid for under this Act"*—language that a State could plausibly interpret to relate to its obligations after it has agreed to comply with the Act. Indeed, based on the text of § 7907(a), Vermont has passed a law providing that neither the State nor its subdivisions will be required to "incur any costs not paid for under the Act in order to comply with the provisions of the Act." Vt. Stat. Ann. tit. 16 § 165 (2003). In short, it is not apparent that § 7907(a) relates merely to the States' freedom to choose whether to opt into the Act in the first place.

Second, the use of the exact language of § 7907(a) in the Perkins Vocational Education Act ("Perkins Act"), 20 U.S.C. §§ 2301–2471 (1988), indicates that this language concerns a State's funding obligations under NCLB, rather than voluntary compliance with the Act. Under the Perkins Act, federal grants are issued to "'assist the States to expand, improve, modernize, and develop quality vocational education programs in order to meet the needs of the Nation's existing and future work force for marketable skills and to improve productivity and promote economic growth.'" *Pennylvania v. Riley*, 84 F.3d 125, 127 (3d Cir. 1996) (quoting 20 U.S.C. § 2301(1)). Section 2306a of the Perkins Act, entitled "Prohibitions," mirrors NCLB's § 7907(a), but adds a final clause:

> (a) Local control. Nothing in this Act shall be construed to authorize an officer or employee of the Federal Government to mandate, direct, or control a State, local educational agency, or school's curriculum,

program of instruction, or allocation of State or local resources, or
mandate a State or any subdivision thereof to spend any funds or incur
any costs not paid for under this Act, *except as required under sections
112(b), 311(b), and 323*.

20 U.S.C. § 2306a(a) (emphasis added). The sections referred to in this final clause
require agencies in participating States to spend non-federal funds for specific purposes.
*See, e.g.*, 20 U.S.C. § 2413(a) (Perkins Act § 323) ("Except as provided in subsection
(b), for each fiscal year for which an eligible agency receives assistance under this Act,
the eligible agency shall provide, from non-Federal sources for the costs the eligible
agency incurs for the administration of programs under this Act, an amount that is not
less than the amount provided by the eligible agency from non-Federal sources for such
costs for the preceding fiscal year."). Thus, the final clause—absent in NCLB—provides
explicit exceptions describing when participating States do have to expend their own
funds when complying with the Perkins Act's requirements. The common language in
these Acts, therefore, does not simply reiterate that States may or may not participate in
the federal program. While there are differences between the Perkins Act and NCLB,
the differences in the overall structure of the statutes do not negate the informative role
that the identical sixty-two-word provision found in both of the statutes can provide. In
the Perkins Act, the sixty-two-word provision is followed by exceptions to the provision.
In NCLB, the sixty-two-word provision is followed by no exceptions. The difference
between the Perkins Act and NCLB in this regard shows that Congress is capable of
explicitly stating when States must provide funding under these Acts. *Cf. Pennhurst*,
451 U.S. at 17–18 ("[I]n those instances where Congress has intended the States to fund
certain entitlements as a condition of receiving federal funds, it has proved capable of
saying so explicitly.").

Third, the Secretary's comparison with the provisions of the UMA sheds little
light here, as (1) NCLB makes no reference to the UMA's definition of "mandate,"
which excludes voluntary participation in federal programs, and (2) "the label 'mandate'
is often applied to obligations that states assume voluntarily in order to qualify for
federal funds." Patricia T. Northrop, Note, *The Constitutional Insignificance of Funding*

*for Federal Mandates*, 46 Duke L.J. 903, 903 n.2 (1997).  Indeed, another section of the UMA itself defines "mandate" to include a duty arising from voluntary participation in federal programs.  2 U.S.C. § 1555 (defining the phrase for purposes of a commission that would review federal mandates).

**E.     Whether NCLB satisfies the clear-notice requirement of the Spending Clause**

Whether or not Congress intended to fund all the costs of compliance with NCLB, if Congress did not provide clear notice to the States, any requirement that States fund the excess costs of compliance is unenforceable.  The Spending Clause permits Congress to condition its grant of federal money to States only if it does so unambiguously.  The appropriate inquiry is not whether Congress *intended* States to fund some of the costs of compliance, but whether it provided the States with *clear notice* of this intention.  *See Arlington*, 548 U.S. at 296.

Viewing the Spending Clause relationship between a State and the federal government as a contract, the Supreme Court has stated that "[t]he legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of th[at] 'contract.'" *Pennhurst*, 451 U.S. at 17.  The Secretary cites *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 669 (1985), for the proposition that "[u]nlike normal contractual undertakings, federal grant programs originate in and remain governed by statutory provisions expressing the judgment of Congress concerning desirable public policy."  The Secretary argues that, in contrast to general contract law, ambiguities in a grant program must not necessarily "be resolved against the party who drafted the agreement, *i.e.*, the Federal Government."  *Id*. at 666.

However, even when the textual ambiguities are resolved in favor of the federal Government, NCLB still fails the Spending Clause inquiry because it does not provide clear notice to States that they must incur the costs of compliance.  In § 6332(b)(1), Congress acknowledged the possibility that it might not be able to provide all of the funds for which States are eligible under NCLB, and Congress provided for a pro rata distribution if such a shortfall were to occur.  But Congress never clearly explained who

would be responsible for the remaining costs if and when it could not cover them. Thus, not only did Congress never specifically articulate that States would be responsible for covering any additional costs of compliance, but Congress's inclusion of § 7907(a) further confuses the issue of potential state liability.

When asking "whether such a state official would clearly understand . . . the obligations," *Arlington*, 548 U.S. at 296, the answer must, therefore, be "No." We need not decide which of the three above described interpretations of § 7907(a) is correct as that is not our relevant inquiry. They are all plausible, and they are all flawed. While the Secretary may be correct that Congress did not intend to provide full funding for NCLB, many reasonable authorities have interpreted NCLB to mean precisely the opposite. "When [Connecticut, Delaware, Illinois, Maine, New Mexico, Oklahoma, Wisconsin, and the District of Columbia] acted to accept NCLB Act funding and to adopt NCLB Act requirements, it was with the understanding that the Secretary of Education would comply with all of the provisions of the NCLB Act, including the Unfunded Mandates Provision." (Amicus Br. of the States of Conn., Del., Ill., Me., N.M., Okla., Wis., D.C. at 4.) Further, the district court, this Court's prior panel majority, and the panel dissent all have interpreted § 7907(a) differently. Even the former Secretary of Education found that § 7907(a) means the opposite of what the current Secretary claims. Consequently, the only thing clear about § 7907(a) is that it is unclear.

## III. CONCLUSION

NCLB rests on the most laudable of goals: to "ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education." 20 U.S.C. § 6301. Here, nobody challenges that aim. But a state official deciding to participate in NCLB reasonably could read § 7907(a) to mean that the State need not comply with requirements that are "not paid for under the Act" with federal funds.

Congress has not "spoke[n] so clearly that we can fairly say that the State[s] could make an informed choice" to participate in the Act with the knowledge that they

would have to spend non-NCLB funds to comply with the Act's requirements. *Pennhurst*, 451 U.S. at 25. If Congress intended otherwise, the ball is properly left in its court to make that clear. *See Arlington*, 548 U.S. at 306 (Ginsburg, J., concurring).

Finally, I would not have this opinion read so broadly as to eviscerate the other mandates of NCLB. The record is clear that the States accepted NCLB funding under conditions spelled out in the Act. There should be no doubt that States and school districts must comply with the mandates to the extent of NCLB funds received and must support their own prior levels of funding as NCLB requires. Plaintiffs' ongoing responsibilities under NCLB are thus among the issues that I would have the parties and the district court consider on remand. Accordingly, I would reverse the district court's judgment dismissing Plaintiffs' complaint and remand for further proceedings consistent with this opinion.

---

**OPINION**

---

SUTTON, Circuit Judge, concurring in the order.  Judge Cole and Judge McKeague have written well-reasoned opinions about this difficult case, but I find myself unable to join either one in full.  I write separately to explain my position, which comes down to embracing Judge Cole's standing and justiciability conclusion and Judge McKeague's merits conclusion at the panel stage.

I.

*Standing*.  I agree with Judge Cole that the school districts have Article III standing to file this lawsuit.  Cole Op. at 9–12.  The school districts have alleged a sufficient "injury in fact":  the Secretary's threatened withholding of federal funds to which they are otherwise entitled.  In a declaratory judgment action, "injury in fact" turns on whether the threatened harm is real and imminent, as opposed to speculative and distant.  *See MedImmune, Inc v. Genentech, Inc.,* 549 U.S. 118, 127–28 (2007).  This threatened harm is real and sufficiently imminent.  The Secretary has consistently denied waivers seeking to evade the Act's requirements due to insufficient federal funding, and the school districts fairly allege that "noncompliance with [the Act's] mandates due to lack of funds will result in the withholding of . . . federal funds."  Compl. ¶ 16; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561–62 (1992).  Putting the school districts to the choice of abandoning their legal claim or risking sanctions "is a dilemma that it was the very purpose of the Declaratory Judgment Act to ameliorate."  *MedImmune*, 549 U.S. at 128 (internal quotation marks omitted).  *South Dakota v. Dole*, 483 U.S. 203, 205 (1987), involved a similar threat—that the government would withhold federal funds—and the Court resolved the merits of that declaratory judgment action without saying a word about standing.

The injury also is fairly traceable to the challenged action of the Secretary, who has authority to withhold the funds and who has declined to relax the testing and

assessment requirements of the Act, even if the school districts cannot meet the requirements with federal funds alone. *See Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180 (2000). And enjoining the Secretary from withholding federal funds for failing to comply with the Act's requirements will redress the threatened injury. *See id.* at 180–81; Cole Op. at 12.

(As an aside, the school districts separately claim injury in fact due to their ongoing expenditure of local funds to comply with the Act. *See also* Cole Op. at 10–11. But this theory does not necessarily establish a redressable injury. An injunction against the Secretary will stop him from cutting off federal funds for non-compliance, but it will not require the States to roll back their statutes and regulations implementing the Act's requirements. A State's alteration of its own statutes and regulations turns on "choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict." *ASARCO Inc. v. Kadish*, 490 U.S. 605, 615 (1989). The pleadings do not disclose how Michigan, Texas and Vermont "implement[] a single, statewide State accountability system" ensuring adequately yearly progress, 20 U.S.C. § 6311(b)(2)(A), but their implementing regulations almost assuredly affect the school districts. Yet because one redressable injury suffices to establish standing, the validity of this alternative theory makes no difference.)

*Ripeness*. The claims also are fit for judicial review, and the districts would suffer hardship if we declined to consider them. *See Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); Cole Op. at 12–14. Because this dispute raises an unvarnished question of law that will not benefit from further factual development, it presumptively is ripe for review. *See Dixie Fuel Co. v. Comm'r of Social Sec.*, 171 F.3d 1052, 1058 (6th Cir. 1999), *overruled on other grounds by Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 157 (2003). "Nothing would be gained by postponing a decision" when "[t]he issue presented in this case is purely legal, . . . will not be clarified by further factual development" and hardship to the parties exists. *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 581–82 (1985); *see* Cole Op. at 13–14.

While further administrative proceedings might sharpen the nature of some of the school districts' claims, they would not alter or make more concrete the nature of the legal question. The Secretary has made his position about the meaning of the Act clear in public statements, in his stance in this case and in related litigation pending in the Second Circuit. Requiring the school districts to seek waivers or propose plan revisions that the Secretary has confirmed he will not grant—because his interpretation of the Act prevents him from doing so—would merely prolong the litigation, already entering its fifth year. Nor would it help any of the participants in this case, least of all the students attending the affected schools, which presumably is why no party raised this issue on its own. *See Union Carbide*, 473 U.S. at 581–82. No Lawyer Left Behind is not the name of the Act.

*Civil Rule 19 (a).* I do not agree that Michigan, Texas and Vermont are necessary parties, now called "required" parties, under Rule 19(a) and cannot agree that we must dismiss the complaint in their absence. Let me start by resisting the idea that we must, or should, suddenly invoke Rule 19 to resolve this case—a rule that would appear for the first time in the record and pleadings of this case in our decision dismissing the complaint. I accept that the federal courts may, as a matter of discretion, raise required-party issues under Rule 19(a) on their own and may do so for the first time on appeal—even when the parties have forfeited the issue. *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 111 (1968); *see also Bowling Transp., Inc. v. N.L.R.B.*, 352 F.3d 274, 281 (6th Cir. 2003). But that does not make the issue one of subject matter jurisdiction, which it is not. *Lincoln Property Co. v. Roche*, 546 U.S. 81, 90 (2005). And it does not establish that we should insert Rule 19(a) into a case whenever it occurs to us, only when it is prudent. This case, and the equally high-profile case pending in the Second Circuit, have been going on since 2005. *See Connecticut v. Spellings*, 453 F. Supp. 2d 459, 465 (D. Conn. 2006). The three affected States—Michigan, Texas and Vermont—surely know about this litigation and just as surely have made considered decisions not to join it. Indeed, it is quite possible that, even if we required the Governors of these States or the Secretaries of their respective

departments of education to join the case, they still would opt not to take a position on the issue at hand. I am not sure we can make a State take a stand on the point, and I know we cannot make it take a coherent one. What we might gain from such a ruling thus is far from clear.

What is more, after the parties filed supplemental briefs before the *en banc* court and after the *en banc* oral argument, we *sua sponte* raised three "justiciability" questions. While the third question asked whether we should proceed in the absence of the States, we did not ask the parties to brief Rule 19—not classically thought of as a justiciability doctrine—and we still have not done so. Not surprisingly, in their supplements to the supplemental *en banc* briefs, no party—and not one of the four *amici* in their merits briefs—identified a lurking Rule 19 problem, and it remains quite possible that all of the participants in this case disagree that there is one. *Cf. Huber v. Taylor*, 532 F.3d 237, 249 (3d Cir. 2008). While no party to the case would be surprised if we resolved the case on ripeness grounds, relying in part on the absence of the States, all parties to the case (I suspect) would be surprised to see us dismiss the case under Rule 19. No doubt, had we discovered an absence of subject matter jurisdiction at this late stage of the case, we would have to dismiss the dispute, no matter how lamentable that development would be, no matter how astonished the parties would be. But I am aware of no precedent that compels us *sua sponte* to insert Rule 19 into the case at this point and to dismiss the case in its fifth year of litigation. In my view, we should answer the question of statutory interpretation that the school districts' complaint asked us to answer and leave Rule 19 out of it.

Be that as it may, Michigan, Texas and Vermont are not "required" parties under Rule 19(a)(1). An entity is a "required party" if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or

>    (ii) leave an existing party subject to substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a)(1).

The first ground for treating the three States as required parties—that the court "cannot accord complete relief" without them, Fed. R. Civ. P. 19(a)(1)(A)—does not exist. The school districts seek to enjoin the Secretary "from withholding from states and school districts any federal funds . . . because of a failure to comply with the mandates of the NCLB that is attributable to a refusal to spend non-NCLB funds." Compl. at 58. Enjoining the Secretary from withholding federal funds from the school districts and the States does not require the presence of the States. It requires only the presence of the Secretary.

It also is far from clear that the three States claim the kind of "interest," Fed. R. Civ. P. 19(a)(1)(B), that is cognizable under the other two grounds for treating the States as required parties. The States do not have a legally protected interest that resolution of the *Pennhurst* question would threaten, a missing ingredient that is fatal in several circuits. *See, e.g., United Keetoowah Band of Cherokee Indians of Okla. v. United States*, 480 F.3d 1318, 1324–25 (Fed. Cir. 2007); *Liberty Mut. Ins. Co. v. Treesdale, Inc.,* 419 F.3d 216, 230 (3d Cir. 2005); *Makah Indian Tribe v. Verity*, 910 F.2d 555, 558 (9th Cir. 1990). The States instead have an "interest in promoting what [they] regard[] as enlightened public policy," *Am. Maritime Transp., Inc.*, 870 F.2d 1559, 1562 (Fed. Cir. 1989)—namely, their vision of how the Act should be interpreted—and have an interest concerning the obligations that come with accepting funding under the Act, *see Liberty Mut. Ins. Co.*, 419 F.3d at 230 (holding "merely a financial interest" is not enough under Rule 19(a)(1)(B)). I recognize that we have not yet spoken clearly on what types of interests Rule 19 encompasses, and I see no need to take a stand today. I note only that the States' presumed "interests" in this case are a distant cry from the types of interests that normally implicate Rule 19(a)(1)(B), and that they are more reminiscent of the kinds of interests that require just notice, not mandatory joinder. *See* Fed R. Civ. P. 5.1

(requiring a party to notify the state attorney general when challenging a state law but not requiring a court to consider whether the state attorney general is a necessary party); *see also Republic of Philippines v. Pimentel*, __ U.S. __, 128 S. Ct. 2180, 2185–86, 2189 (2008) (finding the Republic of the Philippines a required party in case involving claims against the property of Ferdinand Marcos); *Minnesota v. United States*, 305 U.S. 382, 386–88 (1939) (condemnation dispute); *Hooper v. Wolfe*, 396 F.3d 744, 747–48 (6th Cir. 2005) (recovery of diverted assets); *Keweenaw Bay Indian Community v. Michigan*, 11 F.3d 1341, 1343–44, 1347 (6th Cir. 1993) (tribal fishing rights).

Even if the States have a cognizable interest, however, they are not required parties under other requirements of Rule 19(a)(1)(B). Proceeding without them will not "as a practical matter impair or impede" their ability "to protect the[ir] interest[s]." Fed. R. Civ. P. 19(a)(1)(B)(i). When States stick their heads in the sand for nearly five years of litigation about a high-profile lawsuit, it is difficult to say that proceeding without them will impair their interests—which so far seem focused above all on *not* being forced to take a public stand on the issues presented.

Nor is there any risk of prejudice to the States if we proceed to the merits without them. *See Republic of the Philippines v. Pimentel*, 128 S. Ct. at 2189. The matter at hand is not a challenge to the constitutionality of a state law or even to the meaning of a state law. It concerns the meaning of a federal law: Namely, did Congress satisfy the *Pennhurst* clear-statement rule by "clearly" describing "the conditions that go along with the acceptance of . . . funds" under the Act? *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 304 (2006). We know that States need not invariably be parties to *Pennhurst* clear-statement cases because there are many decisions from the Supreme Court involving just a local government as a party, but not a State or even the Federal Government, including one decided a few months ago. *See, e.g.*, *Forest Grove Sch. Dist. v. T.A.*, ___ U.S. ___, 129 S. Ct. 2484 (2009); *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007); *Arlington Cent. Sch. Dist.*, 548 U.S. 291; *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005); *Barnes v. Gorman*, 536 U.S. 181 (2002); *Davis v.*

*Monroe County Bd. of Educ.*, 526 U.S. 629 (1999); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274 (1998); *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60 (1992).

The facts of this case illustrate why that often will be so. Whichever side Michigan, Texas or Vermont ultimately take on this discrete legal question, there is no reason to think that the present parties will not protect it. Perhaps the States (silently) agree with the policy underlying the Act—that the threat of reduced federal funds is precisely the incentive that the States and school districts need to make "adequate yearly progress" in the achievement tests required under the Act. If so, there is no reason to think that the Secretary will not ably advance that position, and in fact he (and she) already has done so in the five years of litigation. Or perhaps the States (silently) side with the school districts, believing that they should not have to meet achievement test standards that they cannot reach with federal funds alone. Here, too, the school districts have ably advanced this position throughout this litigation, and they have ample incentives to continue doing so. In the end, the *Pennhurst* question at the heart of this case turns on an issue of statutory meaning, one that will not change—it cannot change—based on equitable or other considerations that a State might or might not choose to raise.

In the absence of any unprotected interests, no prejudice—not even a risk of prejudice—exists. What we have instead is a frustrating reality: How could the three States, all deeply involved in the implementation of the Act, not take a public stance on how this significant piece of legislation should be construed? Whether as intervening parties or as *amici*, the three States would have done well to offer their views. Yet whatever the explanation may be for their resounding silence, Rule 19(a) does not kick in whenever an entity *should* take a public stand in litigation; it applies only when its absence *irreparably prejudices* the entity's interests. That simply is not the case here.

The last ground for invoking Rule 19(a)(1)—subjecting an *existing* party to multiple or otherwise inconsistent obligations—also is missing. Inconsistent obligations arise only when a party cannot simultaneously comply with the orders of different

courts. *See Delgado v. Plaza Las Americas, Inc.*, 139 F.3d 1, 3 (1st Cir. 1998); *cf. PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 201 (6th Cir. 2001). Here, the Secretary risks only a possible injunction prohibiting him from withholding federal funds if the affected school districts cannot comply with the Act due to inadequate funding. He can readily comply with this order and any subsequent order in cases involving Michigan, Texas and Vermont.

One of Judge McKeague's primary disagreements with me turns on whether we can grant "complete relief" without the States. McKeague Op. at 76–77. Because the districts must follow the Act *and* the existing plans of their respective States, he points out, those plans would have to be amended for the school districts to obtain the relief they seek. But Rule 19 does not turn on the relief that the claimants could have sought but on the relief they did seek. "Rule 19 can be utilized only to bring in parties necessary to a complete and just adjudication of the *issues presently before the court*." *Ross. v. Houston Indep. Sch. Dist.*, 699 F.2d 218, 230 (5th Cir. 1983) (emphasis added); *see also Local 670, United Rubber, Cork, Linoleum and Plastic Workers of Am., AFL-CIO v. Armstrong Rubber Co.*, 822 F.2d 613, 620 (6th Cir. 1987); 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1604 (3d ed. 2009). The claimants do not seek to be relieved from a specific mandate of the Act but only to enjoin the Secretary from withholding funds. That relief is not contingent on actions of the States, and it is relief we have the power to grant. *See LaChemise Lacoste v. General Mills, Inc.*, 487 F.2d 312, 314 (3d Cir. 1973); *cf.* 4 James Wm. Moore et al., *Moore's Federal Practice*, § 19.03[2][d] (3d ed. 2009) ("Joinder should not be compelled when meaningful relief can be granted without the absentee.").

That the three States retain independent authority to withhold funds "[i]n order to enforce the Federal requirements" of the Act, 20 U.S.C. § 1232c(b), or perhaps impose some other form of sanction, does not change things. Rule 19(a)(1)(A) "focuses on relief between the parties and not on the speculative possibility of further litigation" or administrative proceedings "between a party and an absent person." *Sales v. Marshall*, 873 F.2d 115, 122 (6th Cir. 1989) (internal quotation marks omitted). The

States have not threatened or even hinted that they would invoke their § 1232c(b) authority if the school districts won this case, and there is no indication that a State has ever invoked that authority, even though it applies to a wide variety of education programs.  Under these circumstances, indeed, it is quite likely that the school districts would not have had standing to name the States as party defendants to enjoin them from this speculative, ill-defined and distant threat.  Surely Rule 19(a)(1) does not require what Article III prevents.

## II.

That takes me to the merits—the meaning of the No Child Left Behind Act and the nature of the obligation that the school districts and the States undertook when they accepted federal funds under the Act starting in 2002.  As the school districts see it, "states and school districts that accept NCLB funding are *not* required to use their own funds for NCLB compliance," Pontiac Supp. Br. at 12, and accordingly any "failure to comply with the NCLB mandates for this reason does not provide a basis for withholding any federal funds to which they are otherwise entitled under the NCLB," Compl. at 58.  As the Secretary sees it, "a State's obligation to implement its plan is not contingent upon a particular appropriation of federal funds or capped at a particular level of state expenditures."  Final Br. for the Appellee at 17.

## A.

A few rules set the stage for deciding who is right.  Congress passed the Act under the Spending Clause.  U.S. Const. art. 1, § 8, cl. 1.  Congress's spending authority permits it to condition the allocation of federal funds to the States on their compliance with federal regulations, including most notably regulations that Congress otherwise lacks the power to impose.  *See Dole*, 483 U.S. at 207.  Put another way, the Tenth Amendment, the Eleventh Amendment and the Constitution's other structural limitations on congressional authority do not limit properly enacted spending-clause legislation.

Yet other limitations constrain Congress's spending authority: two constitutional limits and a statutory one. As a constitutional matter, Congress may not impose conditions "unrelated to the federal interest" in enacting spending legislation, *id.* at 207–08 (internal quotation marks omitted), and it may not "coerc[e]" the States into accepting funds and the regulations that come with them, *id.* at 211. These restrictions, however, need not detain us here. Surely there is a legitimate connection between the Act's funding and the conditions imposed on the States who accept it. Congress did not give the States federal money for education, then insist that they move the location of their capitals or rename their state birds. Congress asked them to meet a series of educational requirements in return for receiving education funding.

Perhaps more plausibly, the school districts' complaint could be read to include a claim that the Act is unconstitutionally "coercive," a choice-bending contract of adhesion. After all, what State in these fiscally challenging times would have the fortitude to turn down hundreds of millions of dollars in education funding? (Perhaps suggesting that there is something to the point, no State refused aid under the Act, notwithstanding the conditions that came with it.) But in their briefs in the district court and on appeal, the school districts have not claimed that they were coerced into accepting this bargain. Because they have not developed this claim in any way and because they have trained their arguments not on invalidating the Act but on limiting their responsibilities under it, they have forfeited any claim of unconstitutionality.

The statutory limitation on Congress's spending power, by contrast, lies at the core of this dispute. Given the breadth of Congress's power to impose conditions on States that accept federal money, *Arlington Cent. Sch. Dist.*, 548 U.S. at 296, given its authority under the Spending Clause to regulate the States beyond the limited and enumerated powers the Constitution otherwise gives it and given that the States are not represented in the Halls of Congress, the federal courts have required Congress to state those conditions "unambiguously" in the text of the statute, *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Analogizing spending clause legislation to a contract that "requires offer and acceptance of its terms," *Barnes v. Gorman*, 536 U.S.

181, 186 (2002), the Court has explained that Congress's authority to impose conditions on a State "rests on whether the State voluntarily and knowingly accepts the terms of the 'contract,'" *Pennhurst*, 451 U.S. at 17. Just as parties to a contract "cannot knowingly accept conditions . . . which they are unable to ascertain," neither can the States. *Arlington Cent. Sch. Dist.*, 548 U.S. at 296 (internal quotation marks omitted). Spending clause conditions thus bind the States only when Congress spells them out clearly in the text of the law.

Even though this clear-statement rule has constitutional roots, it remains a rule of *statutory* interpretation, one constrained by other canons of statutory interpretation. A State or a school district cannot escape a federal regulation merely by showing *possible* ways in which a law may be unclear; it must identify a *plausible* alternative interpretation of the law consistent with its theory of ambiguity. *See Bell v. New Jersey*, 461 U.S. 773, 783 n.8 (1983) (rejecting a reading of a statute as "no more than remotely plausible" in favor of a better reading of the law even though it imposed additional obligations on the States); *Bennett v. Ky. Dep't of Educ.*, 470 U.S. 656, 672 (1985) (finding no ambiguity in a provision of the predecessor of the NCLB, the Elementary and Secondary Education Act of 1965, Pub. L. No. 89-10, 79 Stat. 27, because "[n]o plausible reading of the statute or regulations suggests that" Kentucky's actions comported with the statute). A State cannot tenably complain about a congressional bait and switch when the alleged "bait" is premised on an implausible reading of the statute. As is true in other areas of the law, the implausibility of an alternative interpretation of a statute defeats a claim of threshold ambiguity. *See Auto-Owners Ins. Co. v. Redland Ins. Co.*, 549 F.3d 1043, 1047 (6th Cir. 2008) (insurance contract); *Zirnhelt v. Michigan Cons'l Gas Co.*, 526 F.3d 282, 287 (6th Cir. 2008) (ERISA plan); *cf. Cuomo v. Clearing House Ass'n, L.L.C.*, __ U.S. __, 129 S. Ct. 2710, 2715 (2009) (*Chevron*).

In gauging statutory ambiguity, the courts also apply a wide-angle, not a telephoto, lens. What matters is not whether a provision is ambiguous when read in isolation but whether it is ambiguous when read in context. *See, e.g.*, *Pennhurst*, 451 U.S. at 19 (Spending Clause); *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S.

120, 132 (2000) (*Chevron*); *Prater v. Ohio Educ. Ass'n*, 505 F.3d 437, 441 (6th Cir. 2007) (contract).

B.

Measured by these yardsticks, the No Child Left Behind Act clearly requires the States (and school districts) to comply with its requirements, whether doing so requires the expenditure of state and local funds or not. A contrary interpretation is implausible and fails to account for, and effectively eviscerates, numerous components of the Act.

The basic bargain underlying the Act works like this. On the federal side, Congress offers to allocate substantial funds to the States on an annual basis—nearly $14 billion in 2008 for Title I, Part A, a 60% increase in relevant federal funding since 2001—exercising relatively little oversight over how the funds are spent. On the State side, the States agree to test all of their students on a variety of subjects and to hold themselves and their schools responsible for making adequate yearly progress in the test scores of *all* students. In broad brush strokes, the Act thus allocates substantial federal funds to the States and school districts and gives them substantial flexibility in deciding how and where to spend the money on various educational "inputs," but in return the schools must achieve progress in meeting certain educational "outputs" as measured by the Act's testing benchmarks. As the Supreme Court recently explained:

> NCLB marked a dramatic shift in federal educational policy. It reflects Congress' judgment that the best way to raise the level of education nationwide is by granting state and local officials flexibility to develop and implement educational programs that address local needs, while holding them accountable for the results. NCLB implements this approach by requiring States receiving federal funds to define performance standards and to make regular assessments of progress toward the attainment of those standards. 20 U.S.C. § 6311(b)(2). NCLB conditions the continued receipt of funds on demonstrations of "adequate yearly progress." *Ibid.*

*Horne v. Flores*, __ U. S. __, 129 S. Ct. 2579, 2601 (2009). The school districts' position—that they can accept the federal dollars, spend them largely as they wish, yet exempt themselves from the Act's requirements if compliance would require any local

money—undoes this bargain by nullifying some provisions of the Act and undermining several others.

*Accountability.* Accountability is the centerpiece of the Act, and a plausible interpretation of the legislation cannot ignore that reality. Instead of focusing on how much money school districts spend on each child or "dictating funding levels," the Act "focuses on the demonstrated progress of students through accountability reforms." *Id.* at 2603. The Act begins with a "Statement of Purpose" that drives home Congress's interest in establishing accountable public schools: "ensuring . . . high-quality academic assessments [and] accountability systems"; "holding schools, local education agencies, and States accountable for improving the academic achievement of all students"; "improving and strengthening accountability"; and "providing . . . greater responsibility for student performance." 20 U.S.C. §§ 6301(1), (4), (6), (7). *See* Appendix (containing the full Statement of Purpose).

Title I, Part A of the Act carries out this objective by requiring participating States to test their students and, over time, to establish and meet certain benchmarks in doing so. Today, the Act requires all public school students in participating States to take seventeen standardized tests over the course of their school careers, *see id.* § 6311(b)(3)(C), and requires the States to grade schools and school districts on their ability to make "adequate yearly progress" in the test results, *see id.* §§ 6311(b)(2)(B), 6316(c)(1). For those participating schools that repeatedly fail to make progress, the Act requires an escalating series of sanctions: (1) starting with "improvement," which gives students the right to transfer into more successful schools and forces schools to develop better practices; (2) moving to "corrective action," which may include a new curriculum, extended hours, or personnel discharges; and (3) ending with "restructuring," which may include discharging large portions of the staff or converting the school into a charter school. *Id.* § 6316(b); *see also id.* § 6316(c).

The Act provides limited exceptions to these accountability measures, and none of them applies here. *See, e.g., id.* §§ 6311(b)(7), 6311(c)(1), 6311(h)(2)(A)(i),

6316(b)(7)(D), 6316(c)(10)(F), 6337(e)(3).  By cabining the Secretary's discretion to excuse failure, the Act furthers an essential objective—the source, indeed, of its title—that no child, whether living in inner-city school districts or not, whether suffering from learning disabilities or not, whether English is their second language or not, whether otherwise disadvantaged or not, would be left behind when it came to ensuring not just that more resources were devoted to their education but that objectively measurable progress would be made in their education.  *See, e.g.*, *id*. § 6301(3) (setting goal of "closing the achievement gap between high- and low-performing children, especially the achievement gaps between minority and nonminority students, and between disadvantaged children and their more advantaged peers").  That is why the Act requires each State to set up an annual system of academic assessments in reading, science and math, *id*. § 6311(b)(3)(A), using "the same academic assessments . . . to measure the achievement of *all* children," *id*. § 6311(b)(3)(C)(i) (emphasis added), providing for "the participation in such assessments of *all* students," *id.* § 6311(b)(3)(C)(ix)(I) (emphasis added), and requiring "*each* local educational agency" to collect appropriate data and reports on all student achievement, *id.* at § 6311(h)(2)(B) (emphasis added).

The school districts' interpretation would break the accountability backbone of the Act.  Excusing school districts from compliance with the Act whenever federal funding fell short would make it hard if not impossible to hold them accountable for meeting the Act's goals.  If school districts decided they were not given enough money to test all children, they could test just some children.  If school districts decided they were not given enough money to fix all underperforming  schools, they could fix just some schools.  Because the school districts have alleged that virtually every major requirement of the Act is underfunded, *see* Compl. ¶¶ 32–86, their interpretation would excuse them from all of these requirements, transforming a no-exceptions accountability system into a non-existent one.

The NAACP supports the Secretary in this case, as well as in the Second Circuit case, not because it is satisfied with the levels of federal funding under the Act (few are)

but because it does not want the Act's accountability measures violated with impunity—letting schools filled with disadvantaged students off the hook. NAACP Br. at 12 ("The panel's decision invites States and school districts to evade their obligations to poor and minority children."). The NAACP's concern is reflected in the Act itself, which begins by saying that the Act is designed "to ensure that *all* children . . . reach . . . proficiency on challenging State academic achievement standards and State academic assessments," "especially . . . disadvantaged" students. 20 U.S.C. § 6301 (emphasis added). With the Act's accountability system in place, these goals have a chance of success; without them, they have no chance of success, risking a return to (or a continuation of) a system of lower standards for higher-poverty schools.

*Flexibility*. The school districts' interpretation is inconsistent not only with the Act's accountability requirements but also with the flexibility the Act gives States and school districts in return for increased responsibility for student achievement. As the Act's Statement of Purpose makes clear, that is the central tradeoff of the Act: "providing greater decisionmaking authority and flexibility to schools and teachers *in exchange for* greater responsibility for student performance." *id*. § 6301(7) (emphasis added); *see also Horne*, 129 S. Ct. at 2601 (the Act "reflects Congress' judgment that the best way to raise the level of education nationwide is by granting state and local officials flexibility to develop and implement educational programs that address local needs, while holding them accountable for the results"). Unlike most spending programs, this one comes with few strings telling the States *how* they should comply with its conditions. Under the Act, States develop their own curricula and standards, 20 U.S.C. § 6311(b)(1), their own tests to assess whether students are meeting those standards, *id.* § 6311(b)(3), and their own definitions of progress under those standards, *id.* § 6311(b)(2)(B), so long as the progress culminates in near-universal proficiency by 2014, *id.* § 6311(b)(2)(F).

This flexibility extends to spending as well. As the school districts rightly acknowledge, the Act "provide[s] school districts with unprecedented new flexibility in their allocation of Title I funds." Final Reply Br. of Pontiac Sch. Dist. at 3 (internal

quotation marks omitted).  Some federal funds, to be sure, must be spent in certain ways. *See, e.g.*, 20 U.S.C. § 6303 (reserving some Title I, Part A funds for school improvement); *id.* § 6317(c)(1) (same); *id.* § 6318(a)(3)(A) (reserving some funds for parental involvement programs); *id.* § 6319(1) (reserving some funds for professional development).  And the Act strictly confines the use of Title I funds to geographic areas with heavy concentrations of low-income students.  *See id.* § 6313(a).  But within these areas and with respect to these priority students, the Act gives States and school districts substantial flexibility in choosing how to spend the money.  For instance:  Section 6314 gives school districts wide discretion to consolidate funds from various sources and to focus them on certain schools in whatever ways will improve student performance there; § 6313(b) gives school districts discretion to transfer funds between schools within certain guidelines; and § 7305b allows States and school districts to transfer up to 50% of the funds allotted to other education programs to supplement their funds under Title I, Part A.

The substantial flexibility the Act gives recipients over federal funds is surpassed by the near-complete flexibility they retain over their own funds.  The only limitation is that participating States cannot reduce their own spending and offset it with federal funding but must use the Act's federal dollars to supplement, not supplant, their own. 20 U.S.C. §§ 6321, 7901.  Beyond that basic requirement—a prohibition on fiscal cheating, really—the States can use their dollars however they see fit, whether for teachers or for computers or for facilities or for whatever else they think will help their students the most.

The express and unprecedented flexibility the Act gives to the States in prioritizing the spending of federal dollars—especially in Title I, Part A—cannot co-exist with an interpretation of the statute that allows school districts to exempt themselves from the accountability side of the bargain whenever *their* spending choices do not generate the requisite achievement.  Were the school districts correct, a State could use this flexibility to focus its federal and local resources almost exclusively on improving, say, teacher quality—a legitimate goal no doubt, but one that would allow

the State to sidestep the Act's mandatory assessment requirements by contending that it lacked the funds to administer them or to make progress under them. *Sch. Dist. of City of Pontiac v. Sec'y of United States Dep't of Educ.*, 512 F.3d 252, 284 (6th Cir. 2008) (McKeague, J. dissenting). That is not what Congress had in mind. It gave the States a clear and consequential choice: between taking the bitter (accountability) with the sweet (unprecedented flexibility in spending federal and state dollars) or leaving the money on the table.

*Costs of Compliance*. Not surprisingly, in view of the expansive flexibility that the Act gives States in spending federal and local funds, the Act says nothing about the bill of particulars at the heart of the school districts' complaint: the costs of complying with the Act's requirements. How could it be otherwise? The Act's spending flexibility necessarily makes it impossible to calculate or even define the costs of complying with the Act's requirements.

The primary formula for allocating Title I, Part A grant money does not say a word about costs of compliance. *See* 20 U.S.C. §§ 6313(c), 6333(a), 6334(a), 6335(a)–(c), 6337. While the Act asks States to submit plans to the Secretary, *id.* § 6311, and asks school districts to submit plans to the States, *id.* § 6312, it does not require either entity to estimate the cost of compliance. Nor, in fulfilling their various reporting responsibilities under the Act, must the States or school districts estimate the costs of compliance. *See*, *e.g.*, *id.* §§ 6311(h), 6316(a)(1)(C). If, as the Supreme Court recently explained, the Act "expressly refrains from dictating funding levels," *Horne*, 129 S. Ct. at 2603, why would Congress exempt failing school districts from the accountability requirements based on inadequate "funding levels"? The school districts have no answer.

But even if Congress wished to make costs of compliance a legitimate excuse for, say, inadequate yearly progress, how would it do so? Once Congress decided to measure accountability by educational outputs (gauged by tests scores), as opposed to educational inputs (gauged by dollars), it made objective measurements of compliance costs virtually

impossible. Any effort to measure these costs surely would vary from school to school, if not from student to student, and they surely would vary from year to year. The phrase "costs of compliance" has no discernible meaning in this context, as the Act leaves it to the States, no matter how little or how much funding Congress provides, to make *discretionary cost choices* about how to make meaningful achievement-related progress.

Take a cost estimate for adding an extra hour to the school day, for lengthening the school year or for hiring more math or reading teachers—all plausible ways to improve a school's achievement scores. Each innovation has an estimable cost, to be sure. But that does not establish that the estimate would lead to the requisite progress. And if it did not, then what? Perhaps extending the school day by one more hour, extending the school year by one more week or hiring one more math or reading teacher would do the trick. But maybe not. What works for one school district might not work for another. What, indeed, works for one classroom might not work for the classroom next door, given the correlation between great teachers and great teaching—and the occasional operation of that principle in reverse. Even more discrete costs like developing and administering tests cannot be accounted for in advance given the considerable flexibility States have under the Act in implementing those requirements. Within certain general limits, a State may develop whatever curricular standards and tests it wants. 20 U.S.C. § 6311(b). The State may use pre-existing standards that meet the Act's requirements, *id.* § 6311(b)(1)(F), or it may create new ones.

In their complaint, to use one example, the school districts say that Brandon Town School District "estimates that . . . it needed to spend $390,000 more than it received in NCLB Title I funding to ensure that the school makes [adequate yearly progress]." Compl. ¶ 65. The school district may be right, and we have no license to say that it is not at this Rule 12(b)(6) stage of the case. The issue, however, is not whether the school districts can fairly say that compliance with "adequate yearly progress" requires more federal dollars than the Secretary has allocated to them. It is whether a State could tenably think that the Act excuses non-compliance whenever a school district maintains that it has insufficient resources to make the required progress. Surely every

school district could do more with more money. And if that is the case, every failing school district could do more with more federal money—and maybe enough to make adequate yearly progress. It is hard to imagine when—or, for that matter, why—a failing school would ever concede that it was getting sufficient federal funds to make such progress.

"Reflecting a growing consensus in education research that increased funding alone does not improve student achievement," the Act moves from a dollars-and-cents approach to education policy to a results-based approach that allows local schools to use substantial additional federal dollars as they see fit in tackling local educational challenges in return for meeting improvement benchmarks. *Horne*, 129 S. Ct. at 2603 & n.17. The Act, in short, rejects a money-over-all approach to education policy, making it implausible that the heartland accountability measures of the law could be excused whenever schools, exercising their flexibility over how to spend federal and local dollars, decided they cost too much.

*Express waiver authority in some areas and silence in others.* Congress knew how to allow the Secretary to waive obligations under the Act, and it did so in discrete circumstances. The Act's general waiver provision allows States and school districts to seek waivers on just two grounds: that the waiver will "(i) increase the quality of instruction for students; and (ii) improve the academic achievement of students." 20 U.S.C. § 7861(b)(1)(B). Neither ground excuses schools from the accountability measures due to insufficient federal funds.

The Act also specifically describes two types of exceptions from the § 6311 accountability requirements. One applies only in case of "exceptional or uncontrollable circumstances, such as a natural disaster or a precipitous and unforeseen decline in . . . financial resources." *Id.* §§ 6311(b)(3)(C)(vii), 6311(b)(7), 6311(c)(1), 6311(h)(2)(A)(i). Not only does neither exemption turn on the sufficiency of federal funding, but one of them—the "unforeseen decline in . . . financial resources"—creates an exemption for sharp declines in local funding, which implies that the Act contemplates local spending.

The other type of exception excuses compliance if federal funding is not sufficient, but again only in limited circumstances. The Act, for instance, allows States to "suspend the administration of, but not cease the development of," annual tests if federal funding falls below certain levels. *Id.* § 6311(b)(3)(D). Section 6311(c)(2) requires States to "participate in biennial state academic assessments of 4th and 8th grade reading and mathematics under the National Assessment of Educational Progress," but only if "the Secretary pays the costs of administering such assessments." Under the school districts' interpretation, that final qualification is unnecessary and indeed pointless. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991) ("[W]e construe statutes, where possible, so as to avoid rendering superfluous any parts thereof."). Congress likewise capped a school district's costs for supplemental educational services at the amount of federal money allocated. *Id.* § 6316(e)(6). As each of these examples show, Congress knew how to excuse schools from compliance based on inadequate funding, but did so only in discrete circumstances—none of them applicable here. *See Hamdan v. Rumsfeld*, 548 U.S. 557, 578 (2006) ("A familiar principle of statutory construction . . . is that a negative inference may be drawn from the exclusion of language from one statutory provision that is included in other provisions of the same statute.").

*Inconsistency between the school districts' interpretation and other provisions of the Act*. Besides conflicting with the hallmark features of the Act and ignoring the implications and inferences that follow from Congress's express waiver provisions in some circumstances but not in others, the school districts' interpretation conflicts with, or is at least in tension with, other provisions of the Act. The Act explicitly anticipates that funding to meet the Act's requirements will come from a variety of sources, not all federal. It requires the Secretary, for instance, to examine how States, school districts and schools have used "Federal, *State, and local educational agency funds* and resources to support schools and provide technical assistance to *improve the achievement* of students in low-performing schools." 20 U.S.C. § 6491(a)(2)(E)(iv) (emphases added); *see also id.* § 6491(a)(2)(E)(v) (requiring a similar inquiry to determine how

they have "used State educational agency and local educational funds to help [certain] schools . . . meet the requirements described in § 6319 of this title of having all teachers highly qualified not later than the end of the 2005–2006 school year"). This provision contradicts the notion that States and school districts need only meet the Act's requirements to the extent federal funds can do the trick.

Some of the Act's accountability measures apply to every school in a participating State regardless of whether the school receives any federal funding at all. *See, e.g.*, *id.* § 6311(b)(2). Other requirements apply to every school in a school district receiving funds, whether or not the school itself receives funds. *See id.* § 6319. Yet these universal accountability requirements cannot be squared with an interpretation of the Act that demands accountability only to the extent a school receives federal funding. *See Pontiac*, 512 F.3d at 274–75 (McKeague, J., dissenting). Otherwise, an unfunded school district would have no accountability responsibilities under the Act, a notion the Act expressly contradicts.

In passing the Act, Congress also knew how to allocate funds for specific purposes—in the nature of traditional input-based funding programs. Some provisions of the Act tell the States exactly how to "use the [federal] funds." *See, e.g.*, 20 U.S.C. §§ 6313, 6362(c)(7)(A), 6372, 6381c, 6383, 6393, 7114. But these provisions make all the more conspicuous the contrast with other provisions of the Act that say nothing about how to spend the money but mention only the accountability benchmarks the States must achieve in using it. *See, e.g.*, *id.* §§ 6311(a), 6316(a). Congress showed that it knew how to write input-based provisions, limiting the States' responsibility to spend certain funds on discrete items, and output-based provisions, allowing the States to spend the money however they wished so long as they achieved the federal benchmarks. We should respect the reality that Congress knew how to distinguish between the two. *See BP America Prod. Co. v. Burton*, 549 U.S. 84, 92 (2006).

*Ongoing implementation of the Act.* If for some reason the States or school districts had any doubt about the nature of the bargain they were undertaking when they

first accepted federal funds under the Act, time has cleared things up. Since 2002, when it passed the Act, Congress has made annual appropriations to the States, and each year the appropriations have not been linked to, or premised on, any effort to ascertain the funds needed to make adequate yearly progress. *See* Compl. ¶¶ 25–31. Yet each year the Department of Education has not wavered: The Secretary consistently has denied attempts to evade the Act's requirements due to insufficient federal funding. By the time the school districts filed this lawsuit in 2005, they plainly were on notice that there was no linkage between the appropriated federal funds and the States' duty to comply with the accountability measures. Notwithstanding that notice, the States continued to participate in the program—continued to accept the spending-legislation offer of funding, as it were, in exchange for the continued obligation to meet the Act's achievement requirements. *See, e.g.*, *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005) (States had sufficient notice of their responsibility under Title IX because the regulations had "been on the books" for some time); *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629, 643 (1999) (same); *cf. Bennett*, 470 U.S. at 669 ("the fact that Title I [of the Elementary and Secondary Education Act of 1965] was an ongoing, cooperative program meant that grant recipients had an opportunity to seek clarification of the program requirements"); *Brown & Williamson Tobacco*, 529 U.S. at 143 (noting in the context of *Chevron* that "[o]ver time, . . . subsequent acts can shape or focus" the initial "range of plausible meanings" that a statute may have). The Act does not permit the school districts to accept one part of the bargain and discard the other, least of all when the passage of time confirms the two sides of the bargain.

## C.

Resisting this conclusion, the school districts argue that 20 U.S.C. § 7907(a), a provision that arrives on page 559 of this 674-page Act, 115 Stat. 1425, 1983, changes everything. Appearing in a section dealing with general rules under the Act, the provision reads in full:

> GENERAL PROHIBITION.—Nothing in this Act shall be construed to authorize an officer or employee of the Federal

> Government to mandate, direct, or control a State, local educational agency, or school's curriculum, program of instruction, or allocation of State or local resources, or mandate a State or any subdivision thereof to spend any funds or incur any costs not paid for under this Act.

20 U.S.C. § 7907(a). According to the school districts, the provision means that the Federal Government may not require the States (or school districts) to spend their own money to meet the Act's requirements—that if the appropriated federal funds do not suffice to meet the accountability measures, the States are free to ignore them. That is not true—for several reasons.

*First*, § 7907(a) by its terms is a rule of construction, which explains how *other sections* of the Act *should not* be "construed." What the school districts urge, however, is something different—to "construe" § 7907(a) itself to create a no-unfunded-mandate exception, to use § 7907(a) to lift § 7907(a) into a sweeping exception to the Act. No one boot straps a boot strap.

Section 7907(a)'s rule of construction has no job to do here. The Act's express trade-off between local flexibility to spend federal funds and local responsibility to obtain output-based progress in doing so has no ambiguity to speak of and thus no ambiguity to be "construed." There is nothing unclear, and no shortage of detail in the 674-page piece of legislation, about this hallmark of the Act. There is no other provision of the Act—at least as far as this dispute is concerned—that calls out for ambiguity-clarifying "constru[ction]."

*Second*, text is context, and a reading of § 7907(a) in its immediate surroundings confirms the modest role it plays. The section merely re-enforces the flexibility that the Act gives to school districts in developing their *own* local programs and spending their *own* funds in tackling local education matters. It functions as an anti-commandeering rule of construction, nothing more. As such, it prevents the Secretary from construing the Act to "mandate" States or school districts (1) to adopt a particular "curriculum" or "program of instruction"; (2) to "allocat[e]" state or school district resources in a particular way; or (3) "to spend any funds or incur any costs not paid for under this Act."

All three limitations parallel the Act's theme of local flexibility—that the States and school districts must be permitted to make their own decisions about how to spend local resources in return for taking on the duty to make progress in a results-driven way. Thus, while the Act requires the schools to make adequate yearly progress, it does not tell them how to do so or mandate the spending of any local money to do so. If satisfying the Act's requirements takes additional money, so be it, but the Act is equally satisfied whether additional costs are incurred or not. Section 7907(a) simply fortifies the Act's focus on results over spending levels, on outputs over inputs. *See Horne*, 129 S. Ct. at 2603 (the Act "expressly refrains from dictating funding levels").

Judge Cole notes that the Federal Government cannot point to "any provision" of the Act "that explicitly spells out the States' [fiscal] obligations under this Act." Cole Op. 26. That is right, but it is consistent with this feature of the Act. The Act does not tell States to *spend*; it tells them to *do*. It does not spell out fiscal obligations; it spells out performance obligations, reporting obligations, parental-involvement obligations, teacher-qualification obligations—all of which the Act makes perfectly clear through hundreds of pages of statutory text. No doubt, these performance obligations cost money, but the Act in general—and § 7907(a) in particular—leave it to the States to make these spending and allocation choices for themselves.

*Third*, as signaled by § 7907(a)'s appearance in a "general" set of provisions, it does not trump specific directives found elsewhere in the Act. "[I]t is a commonplace of statutory construction that the specific governs the general," *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992), and accordingly the school districts cannot leverage § 7907(a)'s "general" rule of construction to destroy the specific bargain offered to the States: the exchange of federal funds with flexibility to spend them in return for a no-excuses commitment to meeting the Act's accountability requirements. The school districts' contrary argument not only ignores this "commonplace" rule of construction but it also undermines other provisions of the Act. To ensure that the Act does not lead local schools to devote fewer local resources to education, the Act requires each participating State to preserve a level of local effort—no less than 90% of the prior

year's expenditures. 20 U.S.C. §§ 6321, 7901. But if we read § 7907(a) in isolation in the manner that the school districts urge, it would bar this requirement as well—as a violation of the prohibition against mandating States to "spend any funds . . . not paid for under this" Act. The school districts correctly acknowledge that § 7907(a)'s general rule of construction does not overrule *this* specific provision, Pontiac Supp. Br. at 20, but they persist in claiming that it overrules the specific bargain at the heart of the Act. They cannot have it both ways. The specific governs the general across the board, not just in some places as opposed to others.

*Pennhurst*, the school districts' featured case, embraced this form of analysis, paying attention to the difference between general and specific statutory provisions. The statute at hand provided that "[p]ersons with developmental disabilities have a right to appropriate treatment, services, and habilitation for such disabilities," 42 U.S.C. § 6010(1) (current version at 42 U.S.C. § 15009(a)(1)), and the question was whether this language imposed mandatory duties or hortatory goals. After comparing the general language of § 6010 to other provisions that imposed express conditions on federal funding, the Court concluded that "[t]he existence of explicit conditions throughout the Act, and the absence of conditional language in § 6010, manifest the limited meaning of § 6010." *Pennhurst*, 451 U.S. at 23. "[A] brief comparison of the general language of § 6010 with the conditions Congress explicitly imposed on the States," the Court reasoned, "demonstrates that Congress did not intend to place either absolute or conditional obligations on the States." *Id.* at 25. The same principle applies here. What was sauce for the States in *Pennhurst* is sauce for the school districts here.

*Fourth*, § 7907 as a whole supports this interpretation. Labeled "Prohibitions on Federal Government and Use of Federal Funds," the section contains other provisions that *all* limit federal officials in imposing *more* conditions on the States than those mentioned in the Act. The other subsections prohibit federal officials from requiring any particular curricula, academic standards or building standards. 20 U.S.C. § 7907(b)–(d). Because words are "known by the company [they] keep[]," *Gustasfson v. Alloyd Co.*,

513 U.S. 561, 575 (1995), these statutory neighbors reenforce the notion that § 7907(a) is an anti-commandeering rule of construction.

*Fifth*, it strains credulity to think that Congress, via a single half-sentence 559 pages into the Act, suddenly blinked, changing the hallmark bargain at the core of this legislation. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions." *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001). The National Legislature "does not . . . hide elephants in mouseholes," *id.*, yet that is precisely what the school districts purport to have found hidden in § 7907(a). *See also Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("Ambiguity is a creature not of definitional possibilities but of statutory context.").

## D.

Stray remarks in the legislative history and offhand comments by former Secretary of Education Rod Paige do not alter this conclusion. Various Senators and Representatives made statements for and against the Act, arguing in some places that it would impose increased costs on the States and in some places that it would not. *See Pontiac*, 512 F.3d at 269–271; *see also id.* at 282–284 (McKeague, J., dissenting). But that makes no difference. The school districts' legislative-history-based arguments about the meaning of § 7907(a) are no more plausible than their text-based ones. In either case, they ask us to embrace an interpretation of § 7907(a) that cannot be reconciled with the hallmark features of the Act. Legislative history also cannot alter the outcome in a clear-statement case. The *Pennhurst* clear-statement rule turns on textual ambiguity, not ambiguity in the legislative history. If there is textual ambiguity and a plausible state-friendly way to read the statute, that ends the matter. But if there is no such ambiguity, there is nothing for the legislative history to clarify. *See Arlington*, 548 U.S. at 304 ("In a Spending Clause case, the key is not what a majority of the Members of both Houses intended but what the States are clearly told regarding the conditions that go along with the acceptance of those funds."); *cf. United States v. Nordic Village, Inc.*,

503 U.S. 30, 37 (1992) ("legislative history has no bearing on the ambiguity point" in applying a clear-statement rule).

The same goes for Secretary Paige's statements, which no one claims deserve deference, whether under *Chevron* or any other doctrine. In one speech, he said that the Act "contains language that says that things that are not funded are not required," Compl. ¶ 15 (quoting Paige speech of Sept. 4, 2003), and in another speech that "if it is not funded, it's not required. There is language in the bill that prohibits requiring anything that is not paid for," *id.* (quoting Paige speech of Dec. 2, 2003). These comments, however, conflict with others in which Secretary Paige "repeatedly" emphasized that "[i]f a state decides to accept the federal funds [offered under the Act], then it's required to implement the law in its entirety." Compl. ¶ 16 (quoting Paige speech of Mar. 25, 2004). More importantly, these words conflict with the *actions* of the Department of Education, which has consistently held States accountable under the Act, whether those States are content with the level of federal funding or not. *See* Compl. ¶ 17–19 (noting the "uniform rejection of requests for waivers from the NCLB mandates based upon a lack of federal funding"). Whatever Secretary Paige meant in his comments nearly six years ago (and it is not clear that they are inconsistent with my reading of § 7907(a)), they are not binding on the Department of Education and cannot create ambiguity where none otherwise exists.

The school districts, lastly, invoke the 1984 Perkins Vocational Education Act, 20 U.S.C. §§ 2301–2471. Their chain of reasoning goes like this: § 7907(a) parallels the first part of § 2306a(a) of the Perkins Act; § 2306a(a), unlike § 7907(a), proceeds to exempt several Perkins Act provisions requiring the expenditure of specific non-federal funds; this exemption implies that these provisions otherwise would conflict with the prohibition; because the exempted provisions require the expenditure of non-federal funds, § 2306a(a) should be read to forbid requiring the expenditure of non-federal funds except as to the specific provisions exempted, and § 7907(a) should be read the same way.

The argument proves too much. Two of the provisions excepted in the Perkins Act—those requiring that States and school districts maintain their financial effort rather than supplanting their previous spending with federal funds, 20 U.S.C. §§ 2391(a), 2413—have counterparts in No Child Left Behind as well. *See id.* §§ 6321, 7901. And although § 7907(a) includes no exceptions for these maintenance-of-effort provisions, no one, the school districts included, *see* Pontiac Supp. Br. at 20, claims that § 7907(a) nullifies the Act's maintenance-of-effort provisions. *See United States v. Atl. Research Corp.*, 551 U.S. 128, 137 (2007) (statutes should not be read to make any provision "a dead letter"). Better, it seems to me, to read § 7907(a) in the context of No Child Left Behind, not the Perkins Act, which was first enacted 18 years earlier and which adds nothing that supports a *plausible* alternative interpretation of § 7907(a).

\* \* \* \* \*

Depending on whom you ask, the No Child Left Behind Act might be described in many ways: bold, ground-breaking, noble, naïve, oppressive, all of the above and more. But one thing it is not is ambiguous, at least when it comes to the central tradeoff presented to the States: accepting flexibility to spend significant federal funds in return for (largely) unforgiving responsibility to make progress in using them. The theme appears in one way or another in virtually every one of the Statements of Purpose of the Act, and it comes across loud and clear in the remaining 674 pages of legislation. That § 7907(a) suddenly transformed the Act into a no-strings-attached grant program, or for that matter an outright gift program, not only ignores the pages of legislation that precede it, but it also ignores the words of § 7907(a) itself and one of the eternal prerogatives of power: control follows money. *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 53 n.109 (1973). Here, unlike prior education funding programs, Congress did not exercise that control by telling the schools how to spend the money but by telling them to get results with it. Time will tell whether Congress was wise to move from conditioning federal funds on "adequate" additional local funding to conditioning federal funds on "adequate" local progress. But no state official who read the Act could plausibly think that Congress intended to impose *neither* condition.

That said, I have considerable sympathy for the school districts, many of whom may well be unable to satisfy the Act's requirements in the absence of more funding and thus may face the risk of receiving still less funding in the future. Yet two Presidents of different parties have embraced the objectives of the Act and committed themselves to making it work. So have a remarkably diverse group of legislators. If adjustments should be made, there is good reason to think they will be. But, for now, it is hard to say that the judiciary will advance matters by taking the teeth out of the hallmark features of the Act. It is the political branches, not the judiciary, that must make any changes, because the Act's requirements are clear, making them enforceable upon participating States and their school districts.

## III.

For these reasons, I concur in the order affirming the district court's judgment.

**APPENDIX**

The purpose of this subchapter is to ensure that all children have a fair, equal, and significant opportunity to obtain a high-quality education and reach, at a minimum, proficiency on challenging State academic achievement standards and state academic assessments. This purpose can be accomplished by—

> (1) ensuring that high-quality academic assessments, accountability systems, teacher preparation and training, curriculum, and instructional materials are aligned with challenging State academic standards so that students, teachers, parents, and administrators can measure progress against common expectations for student academic achievement;

> (2) meeting the educational needs of low-achieving children in our Nation's highest-poverty schools, limited English proficient children, migratory children, children with disabilities, Indian children, neglected or delinquent children, and young children in need of reading assistance;

> (3) closing the achievement gap between high- and low-performing children, especially the achievement gaps between minority and nonminority students, and between disadvantaged children and their more advantaged peers;

> (4) holding schools, local educational agencies, and States accountable for improving the academic achievement of all students, and identifying and turning around low-performing schools that have failed to provide a high-quality education to their students, while providing alternatives to students in such schools to enable the students to receive a high-quality education;

> (5) distributing and targeting resources sufficiently to make a difference to local educational agencies and schools where needs are greatest;

> (6) improving and strengthening accountability, teaching, and learning by using State assessment systems designed to ensure that students are meeting challenging State academic achievement and content standards and increasing achievement overall, but especially for the disadvantaged;

> (7) providing greater decisionmaking authority and flexibility to schools and teachers in exchange for greater responsibility for student performance;

> (8) providing children an enriched and accelerated educational program, including the use of schoolwide programs or additional services that increase the amount and quality of instructional time;

(9) promoting schoolwide reform and ensuring the access of children to effective, scientifically based instructional strategies and challenging academic content;

(10) significantly elevating the quality of instruction by providing staff in participating schools with substantial opportunities for professional development;

(11) coordinating services under all parts of this subchapter with each other, with other educational services, and, to the extent feasible, with other agencies providing services to youth, children, and families; and

(12) affording parents substantial and meaningful opportunities to participate in the education of their children.

20 U.S.C. § 6301, Pub. L. 89-10, Title I, § 1001.

_____

## OPINION

_____

McKEAGUE, Circuit Judge, concurring.  I concur in affirming dismissal.  As explained below, I believe that this case should be dismissed based on justiciability grounds, rather than the merits.  One of the Secretary's longstanding positions throughout this lawsuit has been that Plaintiffs' claims are not justiciable, and I agree.  The length and complexity of the No Child Left Behind Act of 2001 ("NCLB" or "Act") and the multiple and varied parts of our nation's education machinery affected by the Act warrant our pause and certainly belie Judge Cole's contention that this case is neither particularly complicated nor inherently political.

## I

That said, a majority of the court sees it otherwise and has decided to reach the merits, notwithstanding both Plaintiffs' failure to seek administrative remedies and the absence of the States from any involvement in this lawsuit.  Plaintiffs and the Secretary have set forth their views, albeit views that do not encompass all of the important and relevant interests.  Of those expressed views, I believe that the Secretary has the sounder one on the merits of Plaintiffs' claims, as I explained in my dissenting opinion at the panel stage. *Sch. Dist. of Pontiac v. Sec'y*, 512 F.3d 252, 273-84 (6th Cir. 2008) (McKeague, J., dissenting) (vacated).  Thus, assuming that this dispute is justiciable as a majority of the court has so concluded, I concur in Part II of Judge Sutton's opinion.  I write separately, however, to set forth my concerns as to justiciability.

## II

### A.        Justiciability Principles

In its most recent term, the Supreme Court stressed the need for federal courts to be "keenly mindful of [their] institutional role" under Article III of the U.S. Constitution. *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 129 S. Ct. 2504, 2513

(2009). A court should not make a broad, sweeping ruling when a narrower, more limited one will dispose of the case. *See id.* This court has been mindful of its institutional role in recent cases. *See, e.g.*, *Connection Distrib. Co. v. Holder*, 557 F.3d 321 (6th Cir. 2009) (en banc); *Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) (en banc).

One doctrine used by courts to protect their institutional role is justiciability. In *Baker v. Carr*, the Supreme Court defined justiciability as the "[a]ppropriateness of the subject matter for judicial consideration." 369 U.S. 186, 198 (1962). The concept is distinct from jurisdiction, which calls into question whether the cause of action is a case or controversy under Article III or is otherwise "described by any jurisdictional statute." *Id.* With justiciability, "consideration of the cause is not wholly and immediately foreclosed; rather, the Court's inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Id.*

Justiciability covers a number of related, but distinct, "constitutional limitations and prudential considerations," including exhaustion, ripeness, and standing. *Assiniboine & Sioux Tribes of Fort Peck Indian Reservation v. Bd. of Oil & Gas Conservation*, 792 F.2d 782, 787 (9th Cir. 1986) (discussing *Flast v. Cohen,* 392 U.S. 83, 97 (1968)). Whether a party is required under Federal Rule of Civil Procedure 19 or is otherwise crucial for a full and just adjudication of the case also falls under the justiciability umbrella. *Wymbs v. Republican State Executive Comm.*, 719 F.2d 1072, 1076, 1085-86 & n.34 (11th Cir. 1983).

In accordance with its institutional role, after oral argument the en banc court asked the parties to submit supplemental briefs addressing several questions, including the following:

> Are these claims justiciable—specifically, are they ripe for review, *see Abbott Labs. v. Gardner*, 387 U.S. 136 (1967), have plaintiffs exhausted all administrative remedies, *see Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), and can the court properly resolve this case without the presence of the relevant States (Michigan, Texas, and Vermont) as parties or at least without knowing the views of the States on the issues presented?

*Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 676 (6th Cir. 2004) (explaining that a court can raise justiciability issues on its own motion). As explored below, exhaustion and the absence of the States are particularly important considerations in this appeal.

**B.     Exhaustion of Administrative Remedies**

It is undisputed that Plaintiffs have not sought administrative review of any of their claims. Once approved, educational plans under the Act are not set in stone. A school district can craft an amendment to its own local plan or propose one for the statewide plan and submit the proposed amendment for review before the state department of education. *See* 20 U.S.C. §§ 6311(a)(1), (f)(1)(B), 6312(d)(3). The state department of education would review the proposal and, if the department denied it, the school district would have the right to a hearing before the department for a final, written ruling. 20 U.S.C. § 1231b-2(a). If the school district was still dissatisfied, it could appeal the ruling to the Secretary. *Id.* § 1231b-2(b). The Secretary's decision could then be challenged in federal district court under the Administrative Procedure Act, 5 U.S.C. § 500 *et seq.* ("APA"), as the Secretary conceded in a similar case, *Connecticut v. Spellings*, 453 F. Supp. 2d 459, 489 (D. Conn. 2006) ("*Connecticut I*"), as well as in the supplemental brief to this court, Appellee's Supp. Br. at 4.[1]

_____

[1] There is a separate administrative-review process for appealing the Secretary's withholding of funds, recovery of funds, or issuance of a cease-and-desist order. *See* 20 U.S.C. §§ 1234-1234i. Under §§ 1234-1234i, a school district can challenge the punitive measure before an ALJ (complete with discovery and trial-like proceedings), subject to administrative review by the Secretary and judicial review before a federal court of appeals. 20 U.S.C. §§ 1234d(c),(f), 1234(g). This separate process is not

In its lawsuit against the Secretary, the State of Connecticut has raised several claims, including statutory and Spending-Clause claims similar to those brought by the Plaintiffs here. In *Connecticut I*, the district court, Hon. Mark R. Kravitz, set forth in detail a number of sound reasons for requiring the State of Connecticut to seek administrative review prior to bringing its lawsuit. 453 F. Supp. 2d at 482-91.

Some of those same prudential reasons are present here. For instance, faced with a concrete proposal and specific facts, the school district, the state education department, and the Secretary would have the opportunity to craft a compromise solution that would avoid the need for a lawsuit. *See id.* at 485; *see also Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) (explaining that one of the advantages of administrative review is that the objections of various parties can be worked out without the more dramatic measure of a federal lawsuit). Even if a compromise solution could not be hammered out, the parties' positions would be crystallized, providing a fuller record for judicial review as well as presenting a relatively narrow, particularized claim for relief. *Connecticut I*, 453 F. Supp. 2d at 485. This would give the school districts the opportunity to present their arguments within the context of a proposed amendment to a particular feature of the educational system, rather than as broad, sweeping claims. Moreover, the federal court would have the benefit of the Secretary's reasoning on why the proposed amendment violated federal law. *Id.* Pursuing a claim at the administrative level first would not be a hardship to school districts, as the Act sets forth a detailed process for entertaining these types of concrete claims and complaints. *See supra*.

Although the claims in *Connecticut I* mirror those in this case, there is at least one fundamental difference between the two cases. Here, none of the respective States are involved. Given the central role played by States under the regime created by the

---

applicable to the present lawsuit, however, as Plaintiff school districts have not been penalized by the Secretary for any improper use of federal funds, nor has the Secretary discussed this process in any of the briefs submitted here. *See Pontiac Sch. Dist.*, 512 F.3d at 260 n.2 (vacated) (noting that the Secretary had not addressed the exhaustion of administrative remedies and citing to 20 U.S.C. § 1234d).

Act, this is a somewhat startling omission.[2] Were this a more narrow, concrete challenge by a school district seeking an amendment to a plan and having exhausted administrative review, the absence of the States might not be a concern. However, rather than bring a particularized challenge, Plaintiffs made the strategic decision to bring a sweeping one. Consider, for instance, a couple of the "mandates" challenged in their complaint: "develop[ing] standardized tests aligned with the curriculum standards to measure the progress of public school students in meeting those standards" and "ensur[ing] that school staff (teachers and paraprofessionals) meet prescribed qualification requirements." JA 31-32. By asking for a declaration that States and schools not be "required to spend non-NCLB funds to comply with the NCLB mandates," Plaintiffs seek the authority to determine whether federal funds are sufficient to cover the costs associated with testing and staff qualifications. The breadth of their claims and of their requested relief makes Plaintiffs' lawsuit a broad challenge to the fundamental tenets of the Act itself, namely, the universal raising of student academic achievement as evidenced by testing and other accountability metrics, rather than a challenge to one or two isolated features of the Act. *See Gen. Elec. Co. v. EPA*, 360 F.3d 188, 192 (D.C. Cir. 2004). Accordingly, it must be asked whether the absence of the States precludes Plaintiffs from bringing this type of attack at all.

## C.     Federal Rule of Civil Procedure 19

Whether a person or entity must be involved in a lawsuit naturally brings to mind Federal Rule of Civil Procedure 19, *Required Joinder of Parties*. Although neither Plaintiffs nor the Secretary have cited to Rule 19 in their briefs, that provides no grounds for ignoring the rule. It is not surprising that Plaintiffs did not raise the argument, given it is one directly contrary to their position. The Secretary did, in fact, argue on several occasions that this case is not justiciable because the States are not involved in any

---

[2]As an aside, I note that some States *did* participate in this lawsuit as amici curiae. Tellingly, however, none of the States were those with school districts involved in this lawsuit. *See* Amici Curiae Br. of the States of Connecticut, Delaware, Illinois, Maine, New Mexico, Oklahoma, Wisconsin, and the District of Columbia (filed Apr. 3, 2006); Amicus Curiae Br. of the Governor of the Commonwealth of Pennsylvania (filed Apr. 6, 2006).

capacity. *See, e.g.*, Appellee's Post-Argument (en banc) Br. at 8-9; Appellee's Final (panel) Br. at 31-33. In fact, during oral argument before the en banc court, counsel for the Secretary argued that this case was "less fit for review" than the *Connecticut v. Spellings* case because, unlike in that case, no State is a party here. While the Secretary chose not to present the concerns within the framework of Rule 19, the substance of the arguments is more important than the form, especially given Rule 19's focus on the weighing of equitable interests. *See infra.* Of the three justiciability questions that the court presented to the parties post-argument, the third plainly put both parties on fair notice that the court could consider their responses through the prism of Rule 19. But, even setting aside the Secretary's earlier voiced concerns and this court's notice to the parties, justiciability is first and foremost an institutional concern. A court must jealously guard its institutional role to rule only on disputes that are justiciable, including "whether protection for the right asserted can be judicially molded." *Baker*, 369 U.S. at 198.

The States of Michigan, Texas, and Vermont have an obvious interest in the subject of this litigation because each has agreed that it and its public schools will accept federal funds under the Act and be bound by its requirements. The educational program established under Title I of the Act provides funding to the States conditioned on their developing statewide plans approved by the Secretary. The commitments made by the States in their plans are binding on themselves as well as their political subdivisions, including school districts. The States are tasked with ensuring that school districts comply with the Act and statewide plans. 20 U.S.C. § 1232c. While the school districts are themselves interested parties, have rights and duties under the Act independent of the States, and are arguably injured by the Secretary's interpretation of the unfunded-mandate provision, the absence of the States as parties is a glaring omission given their central role in the educational regime created by the Act.

It is sometimes the case that, though parties who should be involved in a lawsuit are not, the lawsuit can nonetheless continue forward in their absence. Thus, while it is beyond dispute that the States play a central role in primary and secondary education,

it must be determined whether they are required parties to this lawsuit and, if so, whether the lawsuit can nonetheless proceed in their absence.

Rule 19 of the Federal Rules of Civil Procedure sets forth a three-step test for courts to use in determining whether an absent party must be joined or the case dismissed if that party cannot be joined. The first matter to consider is whether the States are required parties under Rule 19(a). If the States are required, then the next matter is whether their joinder is feasible or if a lack of subject-matter or personal jurisdiction makes joinder impossible. Third, if joinder is not possible, the equities must be weighed pursuant to Rule 19(b) to determine if the lawsuit can continue in the States' absence or if the case should be dismissed. *Republic of the Philippines v. Pimentel*, 128 S. Ct. 2180, 2188-89 (2008); *Hooper v. Wolfe*, 396 F.3d 744, 747 (6th Cir. 2005).

### 1.      Required Parties

A required party under Rule 19(a) is a party whose absence prevents the court from according "complete relief among existing parties" or a party who "claims an interest relating to the subject of the action" and whose absence "as a practical matter impair[s] or impede[s] the [party's] ability to protect the interest" or "leave[s] an existing party subject to the substantial risk of . . . multiple[] or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a)(1)(A), (B)(i), (ii). In essence, required parties are those "persons having an interest in the controversy, and who ought to be made parties, in order that the court may act on that rule which requires it to decide on, and finally determine the entire controversy, and do complete justice, by adjusting all the rights involved in it." 7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure* § 1604 (3d ed. 2009) ("*FPP*") (quoting *Shields v. Barrow*, 58 U.S. (17 How.) 130, 139 (1854)).

Plaintiffs have requested declaratory and injunctive relief for "states and school districts." JA 67. Plaintiffs do not specify whether the term "school districts" means only Plaintiff school districts or rather all school districts across Michigan, Texas, and Vermont or even Michigan, Ohio, Kentucky, Tennessee, Texas, and Vermont. It can be

inferred that they intended a broad construction, one not limited to just Plaintiff school districts, given that they have also sought relief for "states" even though neither Michigan, Texas, nor Vermont (nor any other State within the Sixth Circuit) is involved in this case.

In *Warshak*, this court found that the plaintiff's facial challenge to a provision of the Electronic Communications Privacy Act of 1986, 18 U.S.C. § 2703(d), was not justiciable. 532 F.3d at 525, 534. One of the problems with plaintiff's attack identified by the court stemmed from the fact that relief was granted to persons other than the plaintiff. The court recognized, "'While district courts are not categorically prohibited from granting injunctive relief benefitting an entire class in an individual suit, such broad relief is rarely justified because injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs.'" *Id.* at 531 (quoting *Sharpe v. Cureton*, 319 F.3d 259, 273 (6th Cir. 2003)). Plaintiffs here have not sought class-action status or fashioned this action as one brought on behalf of another person or entity. How the district court could grant the full relief requested in the complaint is a quandary that has never been explained by Plaintiffs.

It is the case that Rule 19(a)(1)(A) requires that "complete relief" be possible only "among existing parties." So, if the court ignores Plaintiffs' request for relief on behalf of nonparty school districts and States, then any relief could be limited to Plaintiff school districts. But, this leads to another quandary relevant to Rule 19(a)(1)(B): what would it mean for the Secretary to be enjoined "from withholding from . . . school districts any federal funds to which they are entitled under the NCLB because of a failure to comply with the mandates of the NCLB that is attributable to a refusal to spend non-NCLB funds to achieve such compliance"? JA 67.

As Plaintiffs stated during oral argument before the panel, "[P]rimary responsibility to educate children rests with the States." Clearly, the States have a strong interest "relating to" the Act in general and in particular whether school districts should have the discretion to opt-out of certain programs and requirements if the federal funds

in any given year are somehow deemed insufficient. Fed. R. Civ. P. 19(a)(1)(B).  The Act requires that the States wield significant oversight authority vis-à-vis school districts.  The federal funds at issue in this lawsuit flow through the States in accordance with their statewide plans approved by the Secretary and with the districts' own plans approved by the States.  Under the statewide plans, every public school is required to make AYP and is included in the State's accountability system.  The States must ensure that school districts comply with all of the requirements of the Act, as embodied in their statewide plans.  Thus, if Plaintiff school districts were to be granted relief in this case, the States would necessarily fall out of compliance with their own statewide plans in order to accommodate that relief.  As a result, the States would have to submit plan amendments to the Secretary seeking either to carve out exceptions for Plaintiff school districts or to make fundamental, wholesale revisions along the lines sought by those school districts, presumably then applying to all school districts within the States.  Again, though, without any involvement by the States in this case, the court can only make educated guesses about how the States would react to a favorable outcome for these Plaintiff school districts.

The States play a (if not *the*) major role in primary and secondary education within their geographic borders.  They set educational priorities and direction for all of the public schools.  They have a legitimate interest in the funding of education as well as the resources that must be devoted to administering and supervising compliance with their statewide plans.  Even if it could be assumed that the States would desire more discretion in how they can spend federal funds, the States' absence impairs their ability to protect the viability and legality of their plans.

It is suggested that Plaintiffs and the Secretary have adequately argued the legal merits of Plaintiffs' claims and, as a result, there can be no risk of prejudice to the States' interests.  That, however, is too blinkered a view of this case.  Rule 19 is a "creature of equity jurisprudence" and the court must consider not only any legal prejudice, but also any practical prejudice to the States' interests. *FPP* § 1602 (citation omitted); *see also id.* § 1604 ("It should be noted that the prejudicial effect of nonjoinder referred to in

[Rule 19(a)(1)(B)] may be practical rather than legal in character." (citation omitted)). The court must consider the interests of an absent person, even if that person's legal claim is "technically unaffected." *Id.* § 1602 (citation omitted).

While the court is not faced with a pure contract dispute, the Supreme Court has drawn on contract principles when resolving Spending-Clause disputes. *See, e.g.*, *Pennhurst*, 451 U.S. at 17. It is hornbook law that all parties to a contract are necessary in an action challenging its validity or interpretation. *See, e.g.*, *Lomayaktewa v. Hathaway*, 520 F.2d 1324, 1325 (9th Cir. 1975) ("No procedural principle is more deeply imbedded in the common law than that, in an action to set aside a lease or a contract, all parties who may be affected by the determination of the action are indispensable."). This lawsuit is not only missing a party, but arguably the most important party. The Secretary cannot force a State to accept federal funds under the Act. The school districts cannot accept federal funds on their own. Only the States can decide in the first instance whether, after reading the offer sheet (i.e., the Act), to accept the funds and associated requirements for the benefit of the State's public-school students. The interests of the States in this context are too myriad for a political subdivision to protect. And to think that the Secretary, the party sitting across the bargaining table, can adequately represent the States' interests in this dispute is simply not realistic.

To illustrate, let's assume for the moment that Plaintiffs are correct. Section 7907(a) releases recipients from requirements of the Act "if, and only to the extent that, federal funding falls short." Appellant's Br. at 22. The federal government cannot require recipients "to comply with the NCLB to the extent that they do not receive sufficient federal funding to do so." *Id.* at 23-24. As a result, Plaintiff school districts get an injunction permitting them to avoid compliance with a requirement of the Act to the extent that the costs associated with that requirement are somehow deemed too much.

Even if the States agree with Plaintiffs about the meaning of § 7907(a), does it necessarily follow that the States would therefore not be prejudiced by an injunction

favoring these school districts? To take one example, consider the State of Michigan. As part of its statutory provisions governing aid to schools, Michigan mandates, "A district or intermediate district shall comply with all applicable reporting requirements specified in state and federal law." MCL § 388.1619(3). It is clear from the explicit mention of the "no child left behind act of 2001" in that same section that the State had in mind the reporting requirements of the Act. *See id.* § 388.1619(1). Now, Michigan does not make provision for school districts to comply with reporting requirements specified in the Act only to the extent paid for by federal funds. If the Pontiac School District determines that it will not comply with the reporting requirements of the Act and nails the court's injunction on the doors of the Michigan Capitol building, is it really true that the legitimate interests of the State of Michigan have not been prejudiced or that those interests have been adequately protected by the Secretary?

Staying with the State of Michigan, the State requires all school districts to administer the State's merit examination to students in particular grades. Under state law, the merit examination must meet "all of the . . . requirements of the no child left behind act of 2001." MCL § 388.1704b(3)(d)(*ii*); *see also id.* § 388.1704b(2)(d). There is no provision in state law providing that the examination administered by a school district must satisfy the requirements of the Act only if that district deems that the amount of federal funds it receives are sufficient to cover certain costs. One of the requirements of the Act is that all students throughout the state be tested—in Michigan, this would include students of Pontiac School District. Yet, armed with an injunction from this court, could Pontiac School District refuse to participate in Michigan's merits-examination system even though the State otherwise mandates that the system comply with the Act's requirements?

Furthermore, one issue that has come up repeatedly in this case is how to determine whether a particular requirement has been "underfunded." This is an issue that might have benefitted from some development at the administrative level in the context of a more narrow, concrete complaint or proposed plan amendment. Be that as it may, a related issue central to the practical operation of the Act under Plaintiffs'

interpretation is this: which entity should have final authority to make the determination that a particular program or requirement is underfunded? The particular school district? The Secretary? *Or the State*? School districts are, after all, political subdivisions of the States. School districts are subrecipients of federal funds under the Act, while States are primary recipients of the funds. It seems at least plausible that between the two, the States would prefer that they have final authority to determine whether any program or requirement is underfunded. On the flip side, although the Act represents an unprecedented extension of federal policy into primary and secondary public education, the States remain the central players in public education by setting priorities, direction, and spending. It seems at least plausible that the States would prefer that they, rather than the Secretary, have final authority to make the determination. This is certainly an important interest of the States related to the subject matter of this case and not an issue anyone could seriously argue has been adequately addressed on behalf of the States by Plaintiffs or the Secretary.

It must be acknowledged that Plaintiffs and the Secretary have presented both of their respective positions with vigor. However, "interests" encompass more than just legal positions. The States are separate players in our nation's public-education system, or, as Plaintiffs' counsel described during oral argument, the "three-way deal" of public education. In short, it is clear that neither Plaintiffs nor the Secretary fully share or represent the interests of the States, regardless of the outcome of an interpretation of § 7907(a). Thus, the States of Michigan, Vermont, and Texas should be considered required parties under Rule 19(a)(1)(B).[3]

---

[3] Despite Judge Sutton's contention that one of my "primary disagreements" with him centers "on whether we can grant 'complete relief' without the States" under Rule 19(a)(1)(A), it should be clear from the preceding analysis that my primary emphasis is that the States have important interests in the subject of this litigation that are not adequately represented by Plaintiff school districts or the Secretary, a consideration that is sufficient by itself under Rule 19(a)(1)(B) to find that the States are required parties.

## 2.      Feasibility of Joinder

The next matter to consider is whether joinder is feasible. As a sovereign, a State cannot be required by a federal court to join a lawsuit as a party except under certain circumstances not present here. *Grinter v. Knight*, 532 F.3d 567, 572 (6th Cir. 2008) ("The Eleventh Amendment bars suits brought in federal court against a state and its agencies unless the state has waived its sovereign immunity or consented to be sued in federal court."); *In re Hood*, 319 F.3d 755, 762 (6th Cir. 2003) (explaining that Congress can sometimes abrogate a State's sovereign immunity).[4] Because the States have not voluntarily sought to join this lawsuit, and the court cannot require that they join, the States' compulsory joinder under Rule 19 is not feasible.

## 3.      Whether Dismissal is Proper

At the final step, Rule 19(b) requires a weighing of the equities. As this court explained in *Glancy*:

> Courts are to consider at least four factors in assessing whether the action should be dismissed, including (but not limited to), first, to what extent a judgment rendered in the person's absence might be prejudicial to the person . . .; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; [and] fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder.

373 F.3d at 672 (internal quotation marks omitted). When, however, the absent party is a sovereign, the weighing of the equities is more circumscribed. *Kickapoo Tribe v. Babbitt*, 43 F.3d 1491, 1498 (D.C. Cir. 1995). This is "because immunity may be viewed as one of those interests compelling by themselves." *Id.* (internal quotation marks omitted); *cf. Republic of the Philippines*, 128 S. Ct. at 2190 (within the Rule 19(b)

---

[4] A state official can be sued in an official capacity in federal court under *Ex parte Young*, 209 U.S. 123 (1908), again, though, only under certain circumstances, including that the lawsuit not "implicate[] special sovereignty issues." *Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 281 (1997). Plaintiffs chose not to sue any state officials in their official capacities.

context, discussing the importance of the "[c]omity and dignity interests" of a foreign sovereign).

As noted above, declaratory or injunctive relief in favor of Plaintiff school districts will undoubtedly call into question the viability and legality of the current statewide plans. Although the States will not strictly speaking be bound by the judgment, in practice the judgment will undoubtedly impact the States' plans. *See Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110 (1968) (stating that when considering the "interest of the outsider whom it would have been desirable to join," the court should consider the "practical" impact of a judgment on that interest). It is certainly plausible that Plaintiffs' position—that recipients should not have to spend their own money to pay for things mandated by the Act but not fully paid for by the federal government—would be supported by the States. In fact, the State of Vermont has enacted legislation to express that very sentiment. 2005, Adj. Sess., No. 182, § 35 ("[N]either the State nor any subdivision thereof shall be required to spend any funds or incur any costs not paid for under the Act in order to comply with the Act."). Taking a step back, though, it might very well be that some of the state officials understood that when they agreed to accept federal funds under the Act, they also agreed to use nonfederal funds to help pay for new programs, testing, etc. These officials might also have understood that were the Act read to mean what Plaintiffs contend it means, it is possible (maybe even probable) that Congress would rewrite the law with even less favorable conditions than the current version. Finally, it is also conceivable that state officials understood that meaningful improvement in the educational levels of their most disadvantaged students should not be left to unilateral decisions by local officials who might decide to forgo testing and assessment only after concluding that their students were not in fact making the improvement required by the Act.

The other three enumerated factors clearly weigh in favor of dismissal. Given the sweeping nature of Plaintiffs' claims, there is little room to fashion the relief in a way that would lessen the prejudice to the States (and their disadvantaged students) or otherwise lessen the impact on their plans. As to whether the relief that could be granted

would be adequate, the court must consider this from the public's interest "in settling disputes by wholes" rather than from Plaintiffs' particular interest in the lawsuit. *Provident*, 390 U.S. at 111 ("We read the Rule's third criterion, whether the judgment issued in the absence of the nonjoined person will be 'adequate,' to refer to this public stake in settling disputes by wholes, whenever possible, for clearly the plaintiff, who himself chose both the forum and the parties defendant, will not be heard to complain about the sufficiency of the relief obtainable against them."). The relief that could be granted to Plaintiff school districts would be of little practical value by itself; subsequent changes to the statewide plans would have to be made. The fashioning of these statewide plans are complex and require considerable negotiation; they are not merely ministerial in nature. As Governor Edward G. Rendell (Pa.) explained in his amicus brief, "Educational programming and funding questions are not simply a matter of parroting what Congress has set forth in NCLB." Amicus Br. at 16. Thus, for the school districts to get any meaningful relief, they would need the States to develop changes to their statewide plans, propose those changes to the Secretary, and negotiate with the Secretary over the appropriateness of those proposals.

As to the fourth factor, Plaintiff school districts have other remedies available to them. As discussed above, the Act allows a school district to propose a plan amendment and pursue administrative and judicial remedies pursuant to 20 U.S.C. § 1231b-2 and the APA. Nothing in this justiciability analysis would preclude Plaintiff school districts from taking this route.

While this case was filed back in 2005, it is quite young in litigation-terms. The lawsuit is still in its early stages—no answer has been filed, no discovery has been taken, and no trial has occurred. Thus, this is not the case where one party or the court waited until the eleventh hour to raise the absence of the States as a possible ground for dismissal. *See Boone v. Warren*, 166 F. App'x 818, 819-20 (6th Cir. 2006) (in weighing the equities, finding that the defendant's failure to raise the Rule 19 issue until after the jury trial was completed and judgment entered for the plaintiff weighed against dismissal). Likewise, while the failure to intervene can weigh against dismissal in the

normal course, such failure is not a consideration "where intervention would require the absent party to waive sovereign immunity." *Kickapoo Tribe*, 43 F.3d at 1498.

It is also true that from the standpoint of efficiency, the court might better just plow ahead regardless of these justiciability concerns, reach the merits of Plaintiffs' legal claims, and let the chips fall where they may, as a majority of my colleagues would do. But, as this court recognized in *Warshak*, judicial efficiency must give way in the face of the type of intractable justiciability problems presented here. 532 F.3d at 533. Justiciability doctrines, such as ripeness in *Warshak* and the absence of a party here, "like all limitations on the judicial Power, prevent[] us from doing today what can be done tomorrow." *Id.* (internal quotation marks and brackets omitted).

Accordingly, regardless of the merits of the parties' positions, this lawsuit should be dismissed because of the absence of the States of Michigan, Texas, and Vermont.  It is true, of course, that in some other cases a political subdivision like a school district has defended against a claim by raising Spending-Clause arguments similar to those of Plaintiffs', even though the respective States were not parties. *See, e.g.*, *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516 (2007); *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 301 (2006); *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167 (2005).  The Court in those cases issued holdings that were not only binding on the parties, but also, for all practical purposes, binding as precedent on the respective States. Yet, those and other similar cases are distinguishable on several grounds.  In those cases, the issue of whether the lawsuit should be dismissed in the absence of the State was not raised and, because the issue is not a jurisdictional one, the Court was not required to reach the matter on its own motion. *See FPP* § 1603 ("Even if the court is mistaken in its decision to proceed in the absence of an interested person, it does not by that token deprive itself of the power to adjudicate as between the parties already before it through proper service of process." (quoting Fed. R. Civ. P. 19 advisory committee's notes (1966))).  In at least one of the cases, moreover, the respective State did participate in the proceeding as amicus curiae. *See Jackson*, 544 U.S. at 169 (listing the State of Alabama as amicus curiae).

More importantly, the controversies in those and similar cases were narrower in scope than those presented in this lawsuit. *Winkelman* resolved whether parents could pursue claims under the Individuals with Disabilities Education Act ("IDEA") on their own without the assistance of legal counsel. 550 U.S. at 535. The Court specifically noted that its ruling did "not impose any substantive condition or obligation on States they would not otherwise be required by law to observe." *Id.* at 534. In *Arlington School District*, the Court considered whether expert fees were "costs" under the IDEA and thereby recoverable under the act's fee-shifting provision. 548 U.S. at 304. Even *Jackson*, arguably the most far-reaching of the decisions listed above, involved the rather isolated question of whether recipients of federal funds could be held liable for intentional sex discrimination in the form of retaliation under Title IX. 544 U.S. at 183-84.

In contrast, Plaintiffs here pursue a challenge to the fundamental tenets of the Act itself. It cannot be seriously questioned that the Act is markedly different under the parties' respective views. According to Plaintiffs' view, after the federal government appropriates funds, after the Department of Education sets its priorities, after the States set their own priorities and spending, then someone gets to decide whether a particular program or requirement is or becomes "underfunded" and, if so, then the district need not spend any funds on that program or requirement. According to the Secretary's view, though, the federal government offers the States an all-or-nothing proposition—accept the funds and all of the duties, or go it alone without the funds or any of the duties. Every "shall" means "may," every command simply an option, funding permitting—versus—"shall" means "shall" regardless of funding. It is hard to fathom a more divergent set of views of how a federal-funding statute is supposed to work.

This is not a case brought by a recipient or other interested party involving a concrete proposal within a specific factual context. As explained earlier, Plaintiffs could have brought that type of claim after first pursuing their administrative remedies. Having decided to go a different route, they should be confronted with the question of whether they can travel that route alone. I believe that they cannot.

**D.      Crucial for a Fair and Just Resolution**

Even if the States were not "required" parties under Rule 19(a), dismissal of this lawsuit without reaching the merits would still be proper. A court can dismiss a case for a myriad of prudential reasons, including the absence of a party who is crucial to a fair and just resolution of the dispute but who would not fit squarely within Rule 19's framework. *Abbott Labs. v. Gardner*, 387 U.S. 136, 155 (1967) ("And courts may even refuse declaratory relief for the nonjoinder of interested parties who are not, technically speaking, indispensible."); *Emery v. Adams*, 179 F.2d 586, 589 (6th Cir. 1950) ("Even if [the corporation] were not an indispensible party, the court could proceed, in any event against Adams, individually, in its discretion, Rule 19, Federal Rules of Civil Procedure, 28 U.S.C.A., and it was no abuse of judicial discretion to decline to do so.").

The States' interests in the subject of this lawsuit, as well as the equitable factors weighing in favor of dismissal under Rule 19(b) set forth above, likewise weigh in favor of dismissal under general prudential principles. Furthermore, while parents are not required parties under Rule 19(a), it must be acknowledged that they have little voice in the current lawsuit even though they have arguably the second most important interest in the outcome, next to their children's own interest. While parents are consulted when a school district develops a local plan, 20 U.S.C. § 6312(d)(1), the scope of that plan is narrower than a State's own plan. Were the States involved, the broader interests embodied in the statewide plans would be represented. *Id.* § 6311(a)(1).

It is also undisputed that, whatever the merits of the parties' respective arguments, the Act is a lengthy, intricate statutory scheme. It is much more likely that the court would arrive at the correct resolution were Plaintiffs to pursue a claim involving a proposed amendment to a plan that could be considered first at the administrative level where state and federal education officials could bring their professional expertise to bear. Alternatively, faced with a broad claim aimed directly at the meaning and operation of the Act, it can hardly be doubted that the court's decision would be aided by input from the States.

Apart from these concerns, the involvement of the school districts from Vermont and Texas poses its own unique justiciability concerns. The State of Connecticut has brought a similar case against the Secretary raising, inter alia, the same two legal claims at issue in the present case: (a) the unfunded mandate provision prohibits school districts and States from spending nonfederal funds on activities required under the Act but not fully paid for by the federal government; and (b) the unfunded mandate provision violates the Spending Clause. *Connecticut I*, 453 F. Supp. 2d at 480, 491. The case is now on appeal before the Second Circuit. *Connecticut v. Duncan*, No. 08-2437 (2d Cir.).

Assume for a moment that the Second Circuit were to find in favor of the Secretary on the merits, but this court were to find in favor of Plaintiffs. As noted above, Plaintiffs have requested declaratory and injunctive relief on behalf of the States and school districts. Yet, the State of Vermont is within the geographic jurisdiction of the Second Circuit. Although not a party to the *Connecticut v. Spellings* lawsuit, a decision by the Second Circuit in favor of the Secretary would surely reverberate throughout that circuit and embolden the Secretary to continue applying his interpretation of the unfunded-mandate provision to the other States within that circuit. Thus, the State of Vermont could be faced with deciding how to reconcile contrary decisions from two federal circuits, one (the Sixth Circuit) in which a political subdivision of the State is a party to the lawsuit and the other (the Second Circuit) in which the State is geographically encompassed.

Again, though, it is possible that any relief in the present lawsuit could be strictly limited to Plaintiff school districts—i.e., they could be granted greater discretion in how they spend federal funds under the Act without also affording similar relief to the three States or any other school district within those States. Doing so would, at least at first blush, appear to avoid thrusting the State of Vermont into an intercircuit conflict. Yet, now consider the position in which the State of Vermont would find itself. Several of its school districts could unilaterally decide to forgo the programs and requirements set forth in the applicable plans and the Act, yet the remaining school districts that are nonparties to this lawsuit as well as the State of Vermont itself would be required to

comply with the mandates of the Act, as interpreted by the Secretary. And, under this scenario, the Secretary's interpretation would have the backing of the Second Circuit. Were this lawsuit to go forward and were Plaintiff school districts to be awarded relief, the State of Vermont's education system would, in effect, be balkanized by conflicting circuit decisions. Moreover, even without a similar lawsuit winding through the Fifth Circuit, the State of Texas would be in the same situation as the State of Vermont because the State of Texas is currently subject to the Secretary's interpretation of the Act. By granting relief to the Vermont and Texas school districts, the court would be requiring that those States treat some of its political subdivisions in one manner, while at the same time they would be required by the Secretary to treat other parallel subdivisions in a diametrically different manner. This balkanization of the States' educational systems undermines the dignity interest of the sovereign States. *Cf. Alden v. Maine*, 527 U.S. 706, 715 (1999) (The States "are not relegated to the role of mere provinces or political corporations, but retain the dignity, though not the full authority, of sovereignty.").

Moreover, this balkanization could have serious repercussions on the delivery of education services in the affected districts. Under Plaintiffs' view of the Act, Congress relieved them from complying with the Act's requirements whenever the cost of compliance exceeds federal appropriations. However, States and school districts ultimately control the costs of compliance, not the federal government. Thus, a Plaintiff school district itself would determine whether, in its opinion, a particular program was being sufficiently funded by the federal government. The district could then decide to spend its funds on something else because, in the district's judgment, the federal government has not fully funded that program. The parents of economically disadvantaged students, of course, have the least opportunity to choose another school for their children, a school that would fulfill the requirements of the Act. Given that the Act's programs and requirements are specifically intended to help the nation's most disadvantaged students, those left-behind students are precisely the ones to whom the Act attempts to bring long-neglected relief but who would be hurt most by that district's

decision. Permitting school districts to pick-and-choose which programs they will comply with and which they will not would, as the NAACP predicted in this case, "sound the death knell for NCLB." Amicus Br. at 17.

### III

Appellate courts are often required to ignore the proverbial "elephant in the room." Sometimes a party will not bring a particular claim that appears to the court to be a viable one or the party will waive an issue by failing to preserve it below. Appellate courts are bound in almost all cases to consider only the administrative or lower court record, so sometimes important factual developments can have no impact on the case's resolution. Because the rules and limitations of appellate review are fairly well established, justice is still meted out even when an otherwise viable claim, issue, or fact has to be ignored by the reviewing court.

On occasion, however, there are just too many elephants in the room to ignore. Plaintiff school districts argue that the Secretary's interpretation and implementation of the provision violates the plain meaning of the Act as well as the U.S. Constitution's Spending Clause. While the merits of their claims raise interesting questions about the role of the various levels of government in primary and secondary education, the interpretation of a lengthy and complex statute, and the role of legislative history in cases like this, the absence of any of the States as parties creates serious justiciability concerns. Moreover, the involvement of the Texas and Vermont school districts raises serious intercircuit and intrastate problems—problems that are avoided only because the court has decided, in essence, to maintain the status quo with its judgment today. Together these realities constitute a parade of elephants that the court should not ignore or dismiss so breezily.

Accordingly, I would find Plaintiffs' claims, as presented, nonjusticiable. Inasmuch as a majority of my colleagues have seen fit to reach the merits of Plaintiffs' claims, however, I concur in the analysis set forth in Part II of Judge Sutton's opinion and concur in the judgment affirming dismissal of the claims.

_____

## OPINION

_____

JULIA SMITH GIBBONS, Circuit Judge, concurring in part and dissenting in part. My colleagues' opinions are articulate and carefully-reasoned, but I find myself unable to join any of them in full. I concur in Judge Cole's analysis of justiciability and standing and his thoughts about Federal Rule of Civil Procedure 19. And, although Judge Sutton questions the plausibility of any of the possible interpretations of 20 U.S.C. § 7907(a) that Judge Cole discusses, I find much of Judge Cole's analysis persuasive. On the other hand, Judge Sutton's opinion correctly highlights the position of the Spending Clause analysis as a rule of statutory interpretation and logically argues that states enter the bargain offered to them under the No Child Left Behind Act ("NCLB") with the knowledge that their obligations under the statute must inevitably require use of funds in addition to the federal funds they receive. Judge Sutton's view has the strength of common sense, without much scrutiny of the precise language at issue, while Judge Cole's view carefully examines the language of the statute but overlooks the practical implications of the overall context of the NCLB scheme. While I fully appreciate that there are arguments about which approach is legally correct here, from my perspective, the difficulty in choosing between them may well stem from the procedural posture in which we find ourselves.

This case came to us on an appeal from the district court's granting of defendants' motion under Federal Rule of Procedure 12(b)(6). Plaintiffs' complaint is fifty-nine pages long. After its description of the parties, it references the statutory language on which plaintiffs rely, cites two statements by former Secretary of Education Rod Paige (one from the publication *Roll Call* and one from a speech) that plaintiffs claim support their position, sets forth the position of the Department of Education contrary to plaintiffs' interpretation, and describes in great detail the extent to which NCLB funding has been insufficient for compliance with the statute and the nature of the requirements imposed on states and school districts by the statute. (Compl. at 11, 12, 13,

14-22.)   Plaintiffs seek declaratory and injunctive relief based upon the language contained in 20 U.S.C. § 7907(a) of NCLB. They have two allegations: 1) the Secretary of Education is violating this provision by requiring school districts to expend their own funds to comply with NCLB's requirements; and 2) the failure to honor the language of the provision violates the Spending Clause of the United States Constitution. (Compl. at 4.)

Plaintiffs therefore ask for resolution of two different questions: First, what does the provision mean; and, second, if it means that states must expend their own funds to comply with NCLB, whether Congress unambiguously informed the states of this obligation. This bifurcation muddles the fact that the Spending Clause analysis is itself a canon of interpretation. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 15 (1981). Thus, in looking to Congress's authority under the Spending Clause, courts are attempting to discern the meaning of the statute, in particular the contours of states' obligations. *Id.* Relying on the Spending Clause's restrictions for guidance in statutory interpretation, the Supreme Court said that it "must view the [statute] from the perspective of a state official who is engaged in the process of deciding whether the State should  accept [] funds and the obligations that go with those funds." *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Viewing the statutory language from the state officials' perspective, we are thus asked to determine what the statute means. *Id.* If the statutory language does not unambiguously impose obligations on the states, the Spending Clause dictates that the statute cannot be interpreted to require those obligations. In other words, the Spending Clause analysis boils down to rudimentary statutory interpretation: The statute cannot mean what it does not say.

In a sense, we are in an awkward position between two arguably meritorious opinions. First,  given the overall statutory scheme that Judge Sutton describes (Op. of Sutton, J. at 48–59), NCLB does seem to require states to spend their own funds to comply with the statute's requirements. Secondly, however, the language of § 7907(a) is not clear, as Judge Cole demonstrates (Op. of Cole, J. at 26–34), and may not have provided states with clear notice – or, at the very least, plaintiffs have stated a claim to

that effect. The correct answer lies in the interplay between these two views. The question is whether § 7907(a) injects *so much ambiguity* as to cast doubt on the meaning of the rest of the statute. Does it render the statute *so unclear* as to deprive states of notice of their funding obligations?

Judge Cole's opinion ably sets out the reasons that plaintiffs' allegations are sufficient to state a claim. And Judge Sutton ably gives the contrary view. I conclude that plaintiffs have stated a claim, but I differ from both Judge Cole and Judge Sutton in concluding that today is not the time for answering the question of whether a state official would clearly understand that expenditures of state funds are required when necessary to comply with NCLB's requirements. I would stop short of giving that answer and remand the case for further proceedings.

In view of the varying opinions of my colleagues in this case, none of which find the procedural posture problematic, one may reasonably question just what additional record the district court could consider on remand that might assist in the thorny task of statutory interpretation. A couple of possibilities occur to me – this language's interpretation in other contexts and evidence of the actual understanding of the states at the outset. There may well be others.

Although the motion to dismiss considers only the allegations of the complaint, the parties' briefs in the district court and here include much discussion of legislative history. Judge Cole steers clear of reliance on legislative history, focusing on the statutory language. And Judge Sutton discounts the role of legislative history in Spending Clause analysis.[1]

---

[1] Judge Sutton relies on *Arlington* to dismiss the plaintiffs' legislative history arguments. (Op. of Sutton, J. at 30.) *Arlington*, however, found that the legislative history was insufficient to overcome the overwhelming evidence to the contrary, particularly the unambiguous statutory text and relevant case law. 548 U.S. at 304 (concluding that regardless of the "weight this legislative history would merit in another context, it is not sufficient here . . . where everything other than the legislative history overwhelming[ly] suggests" a different conclusion). In this case, the statutory text is ambiguous, and there are no cases on point. Legislative history thus remains pertinent to our analysis.

Even assuming there is no useful legislative history of this statute appropriate for consideration, an assumption in which I lack entire confidence, there may be other legislative materials relevant to notice that the court could consider. The language at issue is hardly unique and is found in a number of statutes other than NCLB. *See, e.g.*, Serve America Act of 2009, 42 U.S.C. § 12645f(a); School-To-Work Opportunities Act of 1994, 20 U.S.C. § 6234. The interpretation of § 7907 might more easily be resolved by guidance from its interpretation in these other statutes, particularly if such language has a generally understood meaning.

Apart from legislative materials, another possibility for help exists. There is nothing in the complaint about how the states in which the school districts are located actually interpreted their funding obligations under NCLB at its inception. This suit was filed several years after the enactment of NCLB and, as Judge McKeague's opinion highlights, the states are not parties. Surely, the states' actual understanding of their obligations from the outset is highly pertinent to whether they had notice.[2] Judge Sutton finds relevant the notice given to plaintiffs by the Department of Education's interpretation of NCLB subsequent to its passage. Although this notice is certainly relevant to the equities of a situation in which states want the benefit of federal funds without assuming the obligations that accompany them,[3] it would seem much more pertinent to the notice issue to know what state officials thought from the outset. *See Arlington*, 548 U.S. at 296. Particularly illuminating is not only what the relevant state officials understood the language to mean when they agreed to the terms of NCLB, but also what they understood the identical language in the School-to-Work Act to mean when agreeing to its terms in 1994.

_____

[2] I note that several states have provided their views in an *amicus* brief: "[Connecticut, Delaware, Illinois, Maine, New Mexico, Oklahoma, Wisconsin, and the District of Columbia] understood, based on the plain language and statutory context of the Unfunded Mandates Provision, that neither states nor local school districts would be required to spend their own funds to comply with the NCLB mandates." (*Amicus* Br. of the States of Conn., Del., Ill., Me., N.M., Okla., Wis., D.C. at 2.) Submission of evidence by the parties as to the states' understanding could shed light on the actual notice states were given.

[3] As an aside, it also seems odd to discount legislative history in favor of looking only at the statutory language but then to supplement the statutory language with post-passage conduct by the executive department charged with implementation of the statute, as Judge Sutton does. (Op. of Sutton, J. at 63–64.)

I conclude that the allegations of the plaintiffs' complaint are at least sufficient to state a claim.  Consequently, I would reverse the grant of the motion to dismiss and remand for further proceedings.  Doubtless, these further proceedings will include more motions and, we may hope, more help in interpreting the statute when a court is next called upon to determine the notice issue.